## TARGET STORES, INC. v. COMMISSIONER OF REVENUE.

244 N. W. 2d 143.

July 2, 1976—No. 46036.

*Warren Spannaus*, Attorney General, and *C. H. Luther*, Deputy Attorney General, for relator.

*Faegre & Benson, Jack D. Gage,* and *Gordon G. Busdicker,* for respondent.

YETKA, JUSTICE.

Certiorari to the Tax Court to review its decision of June 12, 1975, reversing the order of the commissioner of taxation (now commissioner of revenue), who, for purposes of state income tax, allocated the gains realized by the taxpayer, Target Stores, Inc., from the sale of certain lands situated in Texas to its Minnesota gross income for tax years 1970 and 1971. We affirm the Tax Court.

The parties have adopted the Tax Court's findings of fact. Target is a Minnesota corporation with its principal place of business in Minneapolis. It is engaged in the business of owning and operating discount department stores both in this state and other states. Target is a wholly-owned subsidiary of the Dayton-Hudson Corporation.

In the two years immediately prior to the tax years in question Target was engaged in a program of expanding its business operations, and acquired several parcels of land in the state of Texas as sites for its stores. It was Target's policy to acquire sites of a uniform size of 18 to 20 acres; however, in the purchase of the Texas property Target was compelled by the several sellers involved to acquire larger parcels than it desired or needed.

In tax years 1970 and 1971, Target made a total of 12 land sales from the Texas property. The Tax Court found that—

"* * * [t]he portions sold constituted the excess land Target was forced to acquire with respect to each site, and also certain other square footage which was originally intended to be used as parking space but which was never so used. * * * With respect to all twelve of the parcels sold, no effort was ever made to develop the land, and the parcels were sold as expeditiously as was possible."

The Texas property was purchased between June 3, 1968, and

April 23, 1969, and sold between September 23, 1969, and January 22, 1971, as expeditiously as possible. Target realized a gain on the sales of $320,205.61 in 1970 and $1,000,779.11 in 1971, representing a return on its investment of 66 percent. It could reasonably be inferred from the sparse record that the sales were made to investors or businesses interested in locating in the same area as the planned discount stores, and that this accounted for the substantial profit realized by Target on the sales.

Target did not include these gains in either its 1970 or 1971 state income tax return. The commissioner, in reviewing Target's returns, determined that the gains were allocable to Target's Minnesota gross income. The sales were accorded capital gains treatment, resulting in a deduction of one-half of the gains realized. An additional deduction for Federal income tax attributable to the gains on the sales was also permitted. The balance was then apportioned to Minnesota pursuant to Minn. St. 290.19, subd. 1, and the three-factor formula set forth therein.

The sole issue raised on appeal is whether any part of the gains realized from the 12 sales of Texas property is allocable to Target's 1970 and 1971 Minnesota gross income for purposes of income taxation.

Allocation of income to this state for purposes of taxation is governed by Minn. St. 290.17 and is based on a number of considerations, including the type of income, where it is earned, the domicile of the recipient, and the location of income-producing property. Minn. St. 290.17 provides in part:

"Items of gross income shall be assigned to this state or other states or countries in accordance with the following principles:
* * * * *

"(2) * * * Income and gains received from tangible property not employed in the business of the recipient of such income or gains * * * shall be assigned to this state if such property has a situs within it, and to other states only if it has no situs in this state. * * *
* * * * *

"(4) When a trade or business is carried on partly within and partly without this state, the entire income derived from such trade or business, including income from intangible property employed in such business * * * shall be governed * * * by the provisions of section 290.19 [apportionment of the income of a multistate business pursuant to a three-factor formula], notwithstanding any provisions of this section to the contrary. * * *"

The commissioner takes the position that Target is subject to clause (4) because it is engaged in a multistate, unitary business, a point apparently conceded by Target, and that the gains realized from the sale of Texas property were derived from its business and are therefore assignable to Minnesota pursuant to the three-factor formula set forth in § 290.19, subd. 1(2)(a). Target, on the other hand, argues that clause (2) of § 290.17 is controlling and, since the land sold was not used in its business, none of the gains realized is assignable to Minnesota. The Tax Court apparently applied both clauses, ruling that the Texas property was not employed in the business and that it did not benefit the Minnesota operations and therefore was not allocable in any part to this state.

Target argues that clause (2) and clause (4) are mutually exclusive—if gains received from tangible property are derived from the business then that property must necessarily be employed in the business, and conversely, if the property is not employed in the business then gains received from it are not derived from the business. The commissioner, on the other hand, takes the position that clause (4) is broader than clause (2) with the result that gains from the sale of property not employed in the business of the taxpayer could nevertheless be derived from the business. The commissioner relies on the language in clause (4) which provides that the entire income derived from a multistate business is to be apportioned to this state pursuant to section 290.19 "notwithstanding any provisions of this section to the contrary."

In Marshall-Wells Co. v. Commr. of Taxation, 220 Minn. 458, 462, 20 N. W. 2d 92, 94 (1945), this court set forth the constitutional bounds of the state's taxing authority in construing Minn. St. 290.17(4):

"Generally speaking, a state may tax any privilege extended by it and may adopt any reasonable rule for the measurement of such tax, *provided it is not measured by property, or income from property, not within its jurisdiction and not used in connection with or correlated to any business authorized or conducted in the state.* An attempt by the state to exercise its taxing authority upon property located and used *beyond* its jurisdiction constitutes a taking without due process of law."

The constitutional limitation is itself grounded in the use of the income-producing property in the recipient's business. It is through that use that property located outside the taxing jurisdiction acquires a situs within the jurisdiction, thereby justifying the incidence of the tax. Certainly clause (4) cannot be broader than the constitutional limitation permits. Therefore, we conclude that the construction of clauses (2) and (4) advanced by Target is more consistent with the constitutional limitation, and that the appropriate inquiry is whether the gains realized by Target on the Texas sales were received from tangible property employed in the business. To follow the commissioner's interpretation of clause (4) would be to render clause (2) almost meaningless.

This court has apparently never confronted that question with respect to tangible property. It has done so, however, with respect to intangible property, most recently in Montgomery Ward & Co. Inc. v. Commr. of Taxation, 276 Minn. 479, 151 N. W. 2d 294 (1967), and Great Lakes Pipe Line Co. v. Commr. of Taxation, 272 Minn. 403, 138 N. W. 2d 612 (1965), appeal dismissed, 384 U. S. 718, 86 S. Ct. 1886, 16 L. ed. 2d 881 (1966). The criteria developed in those decisions for determining whether intangibles

were employed in the taxpayer's business would seem to be equally applicable to cases involving tangible property.

In Great Lakes Pipe this court was confronted with the issue of whether income from certain securities was derived from a business within the meaning of § 290.17(4) and thus subject to apportionment under § 290.19. The securities were purchased with excess funds of the taxpayer and generally consisted of short-term government and private obligations. Income from the securities was used to meet the taxpayer's business obligations. The court recited the above-quoted passage from Marshall-Wells and essentially equated that standard with the definition of "employed in the business," stating:

"The foregoing definitions of what constitutes 'employment' of intangibles in a business cannot be overlooked. The taxpayer in the instant case derives profit from its investment practices and then uses that profit to pay its expenses and business obligations. This use clearly constitutes employment of income from intangibles in respondent's business operations.

"Since the securities involved in the instant case are 'related to,' 'form an integral part of,' are 'correlated to,' and 'used in connection with' respondent's pipeline business, a unitary one, operated within and without Minnesota, we conclude that the record amply establishes that respondent employed these intangibles in its pipeline business." 272 Minn. 412, 138 N. W. 2d 618.

In Montgomery Ward this court was again confronted with the same issue when securities had been purchased with earnings accumulated from the taxpayer's nationwide retail business in order to further a corporate policy of retaining earnings in anticipation of a change in the economic climate which would make expansion of the business profitable. We summarized our reasoning in Great Lakes as follows:

"(2) Intangible property is employed in a business if the corporation owning the intangible property holds it as a means of

furthering the business operation of which a part is located within the territorial confines of this state.

\* \* \* \* \*

"(4) The evidence established that the intangibles held by Great Lakes Pipe Line Company were a part of one unitary business operation \* \* \* because (a) the business activities produced the income used to purchase the intangibles; (b) the income from the intangibles was commingled with the business earnings of the corporation; the securities were at all times carried as current assets; and the same financial officers controlling the affairs of the pipeline company were responsible for the investments involved; (c) *the increase, gain, and principal of these intangibles was used entirely to pay various expenses and obligations of the business activities.*" 276 Minn. 482, 151 N. W. 2d 296.

Because the Great Lakes case had not been filed when the Board of Tax Appeals decision was made in Montgomery Ward, we remanded for further proceedings and said:

"\* \* \* What the evidence might have been had our decision in the Great Lakes Pipe Line Company case been available at the time of the hearing before the Board of Tax Appeals, we do not know. It is possible that the taxpayer could show that for all practical purposes some part of the amounts up to $300,000,000 held during the period in question and invested in liquid securities was not actually used or usable in its merchandising operation in any significant sense. We recognize the possibility that at some point funds accumulated, held, and invested in anticipation of expansion of a business at a future, but indefinite, date have but a minimal relationship to the successful day-to-day operation of a general merchandising business. Presumably, corporate action segregating this fund was possible. But where the fund so held is not set aside as a reserve for future expansion and made unavailable for current operating expenses; where the management of the investment and reinvestment of corporate

funds in the intangibles is entrusted to the corporate officers who manage the principal business; where the income from the intangibles is commingled with ordinary business income; and where the operating expenses of the business enterprise are paid generally from such commingled funds, the taxpayer's burden of establishing that the intangibles were not employed in the principal business would seem to be an extremely difficult one." 276 Minn. 483, 151 N. W. 2d 296.

The commissioner also cites several decisions from foreign jurisdictions, including the reported case of Johns-Manville Products Corp. v. Commr. of Revenue Administration, 115 N. H. 428, 343 A. 2d 221 (1975), and three Minnesota Tax Court decisions, Ralston Purina Co. v. Commr. of Taxation, Minn. Tax Court Docket No. 1758 (October 10, 1974), American Metal Climax, Inc. v. Commr. of Taxation, Minn. Tax Court Docket No. 1583 (November 9, 1972), and United States Steel Corp. v. Commr. of Taxation, Minn. B. T. A. Docket No. 840 (December 28, 1964), to support the proposition that gains from tangible property *actually* used in the business or held for future use will be subject to apportionment. That is not the case here.

The question presented in the instant case is a close one. While the Texas property was never utilized as a site for a Target store, or for that matter any purpose, the reason for its acquisition was the furtherance of the taxpayer's business, i. e., facilitating the acquisition of store sites. The purchases were apparently made at the direction of those in control of Target's operation, albeit through the agency of the parent Dayton-Hudson Corporation. The unusually large profit realized in the sale of the Texas properties, it can be inferred, was the result of Target's planned development. And at least one of the parcels sold and part of another were originally acquired for use as parking space which it was subsequently determined was not needed.

On the other hand, the Texas property was purchased with funds advanced from Target's parent, not with current or re-

tained earnings. Moreover, it does not appear from the record that the gains were utilized by Target to meet its current operating expenses or business obligations. In the Montgomery Ward decision this court indicated that for property to be employed in the business it must have something more than a minimal relationship to the successful day-to-day operation of the business.

In the instant case the only relationship of the Texas property to the day-to-day operation of the taxpayer's business is that it permitted Target to acquire expansion sites, a very indirect benefit to the business. Beyond that, it does not appear from the record that the business of operating discount department stores was benefited.

Affirmed.