UNION CARBIDE CORPORATION,
Plaintiff–Appellee,

v.

Joe B. HUDDLESTON, Commissioner
of Revenue, State of Tennessee,
Defendant–Appellant.

No. 01–S–01–9109–CH–00082.

Supreme Court of Tennessee,
at Nashville.

May 3, 1993.

Charles W. Burson, Atty. Gen. & Reporter, William E. Young, Asst. Atty. Gen., Nashville, for defendant-appellant.

Charles A. Trost, J. Leigh Griffith, Joseph A. Woodruff, Waller, Lansden, Dortch & Davis, Nashville (Jerry L. Robinson, Sr. Tax Counsel, Union Carbide Corp., Danbury, CT, of counsel), for plaintiff-appellee.

## OPINION

ANDERSON, Justice.

The question we are asked to decide in this direct excise tax appeal is whether or not the taxpayer's capital gains in 1986 from the sale of assets constituted "business earnings," as defined in Tenn.Code Ann. § 67–4–804(a)(1) [1]. Relying on *General Care Corp. v. Olsen*, 705 S.W.2d 642 (Tenn.1986), the Chancellor found that the taxpayer's 1986 capital gains were "nonbusiness earnings," and therefore not taxable in Tennessee. We agree and affirm.

### *FACTUAL BACKGROUND*

The facts in this record are, for the most part, stipulated. The balance of the proof is largely undisputed. We summarize it as follows:

The plaintiff-taxpayer, Union Carbide Corporation ("Union Carbide"), is a multinational corporation organized and incorporated under the laws of New York with its

---

1. **"67–4–804. Miscellaneous definitions—Legislative intent.**—(a) DEFINITIONS. As used in parts 8 and 9 of this chapter, unless the context otherwise requires:

(1) "Business earnings" means earnings arising from transactions and activity in the regular course of the taxpayer's trade or business and includes earnings from tangible and intangible property if the acquisition, management and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations;

....

(5) "Nonbusiness earnings" means all earnings other than business earings; ...." (Supp. 1992).

principal place of business and commercial domicile located in Danbury, Connecticut. Union Carbide does business all over the world, including Tennessee, where it owns and operates carbon products plants in the Tennessee cities of Clarksville and Columbia.

Prior to the 1986 disposition of assets that is the subject of this litigation, Union Carbide's operations were divided into five industry segments or divisions, each of which was composed of a number of distinct lines of business. The five industry segments or divisions consisted of:

(a) *Petrochemicals* consisting of the production and sale of polyolefins, ethylene oxide/glycol, industrial chemicals, solvents and coatings materials, and international petrochemicals;

(b) *Industrial Gases* consisting of the production and sale of atmospheric gases, process gases, specialty gases and industrial gas services;

(c) *Metals and Carbon Products* consisting of the production and sale of electrode systems, carbon products and metals;

(d) *Consumer Products* consisting of the production and sale of battery products, plastic wrap and bags, and automotive products; and

(e) *Technology Services and Specialty Products* consisting of the production and sale of agricultural products, specialty chemicals, silicones and urethane intermediates, engineering and technology services, electronic components and materials, and medical and industrial services.

In August of 1985, Union Carbide announced a restructuring program under which it planned to repurchase some of the outstanding shares of its common stock and divest itself of certain non-strategic assets and businesses. The assets Union Carbide contemplated selling under the 1985 restructuring program included (1) the Films–Packaging Business of the Technology Services and Specialty Products Division, (2) the Specialty Polymers and Advanced Composites Business also of the Technology Services and Specialty Products Division, and (3) the Metals Business of the Metals and Carbon Products Division.

The restructuring program was necessitated by financial difficulties stemming from the Bhopal, India, accident. In December of 1984, gas escaped from a Union Carbide storage tank in Bhopal, India, and caused numerous fatalities. Union Carbide's liabilities as a result of this accident caused its stock shares to decrease in value from $55 per share to $32 per share in the ten days immediately following the accident. In addition, the accident resulted in complex litigation against Union Carbide which was eventually settled on February 14, 1989, for 470 million dollars.

Before the 1985 restructuring program was completed, Union Carbide learned that it was the target of a hostile tender offer of $68 per share by G.A.F., a New Jersey chemical company. The tender offer stated that G.A.F. intended to sell substantially all of the Consumer Products Division, the Metals and Carbon Products Division, and a substantial number of businesses in the Technology Services and Specialty Products Division.

In response, Union Carbide's Board of Directors examined the tender offer and, with the advice of the company's financial advisor, Morgan Stanley and Co., Inc., determined that the G.A.F. offer was inadequate. As a result, the Board informed the shareholders that accepting the tender offer would not be in their best interests and recommended that they not tender their shares pursuant to the G.A.F. offer.

In an effort to counter the G.A.F. offer, the Board of Directors commenced its own exchange offer of $85 per share to the shareholders, which was ultimately successful and resulted in the abandonment of the unsolicited offer by G.A.F. Pursuant to Union Carbide's exchange offer, approximately 38,800,000 shares of its stock, which comprised approximately 56 percent of the shares then outstanding, were repurchased for approximately 3.297 billion dollars from the shareholders. In connection with the exchange offer, approximately 1.05 billion dollars was distributed to the remaining

shareholders after redemption of the 38,-800,000 shares. Thus, the total amount distributed to Union Carbide's shareholders in connection with the exchange offer was approximately 4.347 billion dollars.

To raise the 4.347 billion dollars, Union Carbide sold and completely liquidated seven distinct lines of business in 1986. The seven lines of business sold by Union Carbide comprised all of its Consumer Products Division, and most of the businesses in its Technology Services and Specialty Products Division. In addition, Union Carbide sold its corporate headquarters building in Danbury, Connecticut. These sales, however, only raised 3.637 billion dollars. The remainder of the money necessary to make the 4.347 billion dollars distribution to the shareholders had to be borrowed by Union Carbide.

With respect to the capital gains realized on the 1986 sales of the seven lines of business and the corporate headquarters building, Union Carbide initially reported them as "business earnings" on its 1986 Tennessee Foreign Corporate Franchise and Excise Tax Return. Shortly after filing its 1986 return, however, Union Carbide filed an amended return, which reported the capital gains as "nonbusiness earnings," and requested a refund of 1986 excise taxes in the amount of $925,021. The Tennessee Department of Revenue denied Union Carbide's claim, and as a result, Union Carbide instituted this refund litigation.

Throughout its history, Union Carbide has engaged in various transactions in which it acquired or sold business assets. As a result of its practices in acquiring and divesting itself of assets, and in an effort to maintain some expertise in the area, Union Carbide created an Acquisitions and Divestiture Group in 1977 to control, manage, and negotiate its acquisitions and divestitures. From 1980 to 1988, the Acquisitions and Divestiture Group of Union Carbide oversaw several acquisitions and divestitures of stock in other companies for 5 million dollars or more. The acquisitions during this period included: (1) Catalyst Technology, Inc. for 9 million dollars in 1984, (2) Katalistiks International B.V. for

101 million dollars in 1984, (3) STP Corporation for 87 million dollars in 1985, and (4) Amerchol Corporation for 22 million dollars in 1986. The divestitures included: (1) Jacques Seeds Co. for approximately 40 million dollars in 1980, (2) Black Marlin Pipeline Co. for 17 million dollars in 1984, and (3) Catalyst Technology, Inc. for 7.5 million dollars in 1986.

Although it had engaged in the divestitures described above, Union Carbide had never engaged in a transaction similar to the 1986 exchange offer. The 1986 disposition of assets was different from previous divestitures in that the proceeds of the 1986 sales were distributed to Union Carbide's shareholders. In all prior divestitures of business assets, the proceeds were re-invested in Union Carbide's ongoing business operations.

The 1986 disposition of assets also differed from previous divestitures in several other respects. First, the 1986 dispositions involved seven complete lines of business in which Union Carbide ceased to be engaged following the disposition. Union Carbide had never before liquidated a complete line of business. Second, the 1986 dispositions involved profitable lines of business, including its most profitable division and "crown jewel," its Consumer Products Division. All prior dispositions had involved unprofitable business assets. Third, the capital gains from the 1986 dispositions were reported for financial accounting purposes as income from "discontinued operations," while the income resulting from all prior dispositions of assets was reported for financial accounting purposes as "ordinary operating income."

Finally, the 1986 dispositions required by the Bhopal disaster and the ensuing hostile tender offer were of a magnitude vastly larger than all prior divestitures combined. From 1973 to 1988, excluding 1986, Union Carbide had combined divestitures totaling 875.2 million dollars. In 1986, Union Carbide had divestitures totaling 3.652 billion dollars. Other than 1986, Union Carbide only had three years between 1973 and 1988 in which divestitures were over 36 million dollars. In 1980, divestitures to-

taled 134 million dollars, while in 1981 divestitures totaled 292.5 million dollars, and in 1985, divestitures totaled 276 million dollars. Moreover, as a result of the 1986 dispositions, Union Carbide's net worth was reduced from approximately four billion dollars to approximately one billion dollars, and its total number of employees decreased from approximately 93,000 to approximately 51,000.

### TRIAL COURT FINDING

Relying upon this Court's decision in *General Care Corp. v. Olsen,* 705 S.W.2d 642 (Tenn.1986), the Chancellor found, in the memorandum opinion, that:

> Union Carbide's capital gains derived from the sales of lines of business in the tax year were 'nonbusiness earnings.' The sales of the assets of lines of business were dissimilar to any other property dispositions in the history of Union Carbide, including the activities of Union Carbide's Acquisition and Divestiture Group. The income derived from the sales was distributed to the Union Carbide shareholders. Moreover, Union Carbide's complete liquidation of the lines of business were of an extraordinary nature outside the scope of the regular course of its business operations. *See General Care, supra.*

As a result, since the parties had stipulated that the capital gains could not be "allocated" to this state under Tenn.Code Ann. § 67–4–810 [2] if they were found to be "nonbusiness earnings," the Chancellor held that Union Carbide was entitled to an excise tax refund in the amount of $925,021.00, plus statutory interest. In addition, the judgment provided that Union Carbide was entitled to attorneys' fees and litigation expenses to be determined in accordance with Tenn.Code Ann. § 67–1–1803(d) after the final disposition of this appeal.

### "BUSINESS EARNINGS" AND "NONBUSINESS EARNINGS"

■ The determinative issue on appeal is whether the Chancellor correctly determined that the capital gains realized by Union Carbide on its 1986 sales of seven lines of business and its corporate headquarters building constitute "nonbusiness earnings," as opposed to "business earnings," for corporate excise tax purposes. Pursuant to Tenn.R.App.P. 13(d), our review of findings of fact is *de novo* upon the record of the Chancery Court, accompanied by a presumption of the correctness of the Chancellor's findings, unless the preponderance of the evidence is otherwise. *Tenn–Tex Properties v. Brownell–Electro, Inc.,* 778 S.W.2d 423, 425 (Tenn.1989). However, when there is no conflict in the evidence as to any material fact, as in this case, the question on appeal is one of law, and our scope of review is *de novo* with no presumption of correctness accompanying the Chancellor's conclusions of law. *Estate of Adkins v. White Consol. Indus., Inc.,* 788 S.W.2d 815, 817 (Tenn.App.1989).

■ Excise taxes are levied upon corporations for the privilege of doing business in this state. *Federated Stores Realty, Inc. v. Huddleston,* 852 S.W.2d 206, 208 (Tenn.1992). Tennessee's excise tax on corporate earnings, codified at Tenn.Code Ann. §§ 67–4–801 to 67–4–822, was enacted in 1976 and derived from the *Uniform Division of Income for Tax Purposes Act* (UDITPA), a model act prepared by the National Conference of Commissioners on Uniform State Laws. *General Care Corp. v. Olsen,* 705 S.W.2d 642, 644 (Tenn.1986). The purpose of the model act was to provide, for state tax purposes, a uniform method for dividing among the several states the total earnings of a corporation doing business in more than one state.

---

**2.** Capital gains from sales of tangible personal property that constitute nonbusiness earnings are allocated to Tennessee if "[t]he property had a situs in this state at the time of the sale; or ... [t]he taxpayer's commercial domicile is in this state and the taxpayer is not taxable in the state in which the property had a situs." Tenn.Code Ann. § 67–4–810(c)(2) (1989). Union Carbide's capital gains could not be allocated to Tennessee in this case because none of the property sold in 1986 had a situs in this state at the time it was sold, and because Union Carbide's commercial domicile is in Connecticut.

*Holiday Inns, Inc. v. Olsen,* 692 S.W.2d 850, 852 (Tenn.1985).

As enacted in Tennessee, the UDITPA essentially establishes two methods by which corporate income will be divided for excise tax purposes. These two methods are "apportionment" and "allocation," and the particular method by which corporate income is divided depends upon whether the income is classified as "business earnings" or "nonbusiness earnings." *General Care Corp.,* 705 S.W.2d at 644.

"Business earnings" are defined as "earnings arising from transactions and activity in the regular course of the taxpayer's trade or business and includes earnings from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." Tenn.Code Ann. § 67–4–804(a)(1) (1983, 1989, & Supp.1992). If income is classified as "business earnings," it is "apportioned" by using a three-factor formula that takes into account the corporation's payroll, property, and sales. Tenn.Code Ann. § 67–4–811 (1989 & Supp. 1992).

"Nonbusiness earnings," on the other hand, are defined as "all earnings other than business earnings." Tenn.Code Ann. § 67–4–804(a)(5) (1983, 1989, & Supp.1992). If income is classified as "nonbusiness earnings," it is generally traced to its source in a particular state and "allocated" to that state under Tenn.Code Ann. § 67–4–810 (1989).

In this case, classifying the capital gains realized by Union Carbide as "business earnings" would subject the earnings to Tennessee excise tax even though none of the property sold was located in Tennessee; whereas, classifying the gains as nonbusiness earnings would not subject them to Tennessee excise tax.

■ In determining whether corporate income is "business earnings" or "nonbusiness earnings," this Court has applied what is referred to as the "transactional test." *See Federated Stores,* 852 S.W.2d at 210; *General Care Corp.,* 705 S.W.2d at 644–48. Under the transactional test, which is rooted in the definition of "business earnings" as "earnings arising from transactions and activity in the regular course of the taxpayer's trade or business," relevant considerations include, but are not limited to, the frequency and regularity of similar transactions, the former practices of the business, and the taxpayer's subsequent use of the income. *Id.,* 705 S.W.2d at 644. These inquiries ensure that the disposition, as well as the acquisition and management, of the property is an integral part of the taxpayer's regular trade or business operations. *Id.,* 705 S.W.2d at 646. Thus, the controlling factor under the transactional test is the nature of the particular transaction giving rise to the income. *Id.*

■ Other jurisdictions, however, have applied what is referred to as the "functional test," which focuses on the language stating that "business earnings" include "earnings from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." *Id.,* 705 S.W.2d at 645. In contrast to the transactional test, income from the sale of an asset will be considered business income under the functional test if the asset produced business income while it was owned by the taxpayer, irregardless of the extraordinary nature or infrequency of the transaction disposing of the property and giving rise to the gain. Therefore, no significance is attached to the fact that a transaction involves a liquidation. *Id.*

In this case, the Commissioner contends that regardless of which test is employed, Union Carbide's capital gains from its 1986 divestitures constituted "business earnings." The Commissioner argues that the capital gains were "business earnings" because: (1) Union Carbide regularly, frequently and systematically acquired and divested assets in an attempt to strengthen its portfolio of business assets, (2) the assets sold by Union Carbide during the 1986 tax year were integral to Carbide's business, (3) the sale of the assets was for the business purpose of protecting Union Carbide from a hostile takeover attempt by

another corporation, and (4) Union Carbide did not go through a complete liquidation, but remained in business after the assets were sold. We find no merit to these arguments.

While it is true that Union Carbide regularly acquired and disposed of business assets, and even created the Acquisitions and Divestiture Group to maintain some expertise in the area, the question in Tennessee under the transactional test is whether the capital gains from the 1986 disposition of assets were "earnings arising from transactions and activity *in the regular course of the taxpayer's trade or business.*" Tenn.Code Ann. § 67–4–804(a)(1) (emphasis added); *General Care Corp. v. Olsen,* 705 S.W.2d at 644. In answering this question, relevant considerations include the frequency and regularity of similar transactions, and the former practices of the business. *General Care,* 705 S.W.2d at 644.

█ The record in this case clearly demonstrates that Union Carbide's 1986 divestitures did not occur in the regular course of its business. Union Carbide had never before completely liquidated a line of business; however, in 1986, the taxpayer liquidated seven complete lines of business. Furthermore, Union Carbide previously had liquidated only unprofitable business assets. In 1986, however, the taxpayer liquidated profitable lines of business, including its most profitable division and "crown jewel," its Consumer Products Division. Moreover, the 1986 divestiture was twelve and one-half times greater than the next largest divestiture in a single year, and over four times larger than all other previous divestitures since 1973 combined. The 1986 divestitures totaled 3.652 billion dollars, while divestitures in 1981, the next largest single year, totaled 292.5 million dollars, and all previous divestitures since 1973, excluding 1986, totaled 875.2 million dollars. Accordingly, we conclude that although Union Carbide regularly acquired and disposed of assets, the capital gains from the 1986 divestitures were not "business earnings" arising out of the regular course of Union Carbide's business because

it had never before engaged in similar transactions of this magnitude.

Our conclusion is supported by another relevant consideration under the transactional test, the taxpayer's subsequent use of the income. *General Care,* 705 S.W.2d at 644. Under the transactional test, earnings re-invested in the business, or held for use in the regular course of on-going business operations, have been held to be properly apportionable as "business earnings." *Id.* (citing *Champion Int'l Corp. v. Bureau of Revenue,* 88 N.M. 411, 540 P.2d 1300, 1304 (Ct.App.1975); *Sperry & Hutchinson Co. v. Department of Revenue,* 270 Or. 329, 527 P.2d 729, 731 (1974)). On the other hand, earnings received from the sale of assets as part of a plan of liquidation, without re-investment of the proceeds in on-going business operations, have been held to be "nonbusiness earnings" outside the scope of the taxpayer's regular course of business. *Id.* (citing *Western Natural Gas Co. v. McDonald,* 202 Kan. 98, 446 P.2d 781, 784 (1968); *McVean & Barlow, Inc. v. New Mexico Bureau of Revenue,* 88 N.M. 521, 543 P.2d 489, 492 (Ct.App.1975)).

In this case, Union Carbide liquidated seven lines of business and its corporate headquarters building, thereafter distributing all of the proceeds to its shareholders. The gains were not reinvested in the ongoing business operations. Thus, the taxpayer's use of the income supports the conclusion that the proceeds were "nonbusiness earnings" outside the scope of the taxpayer's regular course of business.

The fact that Union Carbide did not go through a complete liquidation, but remained in business after the divestitures, does not, as the Commissioner urges, make the proceeds "business earnings." This same argument was rejected in *Federated Stores.* Likewise, in *General Care,* although that case involved a complete liquidation, this Court pointed out that a business does not have to undergo a complete liquidation for divestiture proceeds to be considered "nonbusiness earnings."

The Court in *General Care* relied on *McVean & Barlow, Inc. v. New Mexico Bureau of Revenue,* 88 N.M. 521, 543 P.2d

489 (Ct.App.1975). In that case, the taxpayer was a corporation engaged in the business of laying pipeline of two varieties, small diameter (little-inch work) and large diameter (big-inch work). In a major reorganization plan, the corporation liquidated the big-inch pipeline business and the proceeds derived from the sale were held to be nonbusiness income. The New Mexico Court of Appeals held that the sale of the equipment did not constitute an integral part of the taxpayer's regular trade or business operations because "the transaction in question was a partial liquidation of [the] taxpayer's business and a total liquidation of the taxpayer's big-inch business." *Id.*, 543 P.2d at 492.

Similarly here, the 1986 divestiture was a partial liquidation of Union Carbide's business and a total liquidation of seven lines of business, including all of the businesses in the Consumer Products Division. Accordingly, we find that the proceeds from Union Carbide's sale of assets did not arise out of the regular course of the taxpayer's business.

The Commissioner, however, argues that even if the 1986 divestitures were liquidations outside the regular course of Union Carbide's business, the proceeds are "business earnings" because the assets sold were integral to the plaintiff's business, and because the assets were sold for the business purpose of protecting Union Carbide from a hostile takeover attempt. This argument, in essence, advocates that we adopt the alternative functional test followed by other jurisdictions. We find no merit in this argument.

In *General Care*, we found "the Commissioner's position that the 'disposition' of property need not be within the scope of the taxpayer's regular business operations in order to give rise to business income contrary to the plain language of the statute." *Id.*, 705 S.W.2d at 646. Accordingly, we rejected the Commissioner's argument "that income from the sale of property is to be considered business earnings if the property sold constituted an integral part of the taxpayer's business." *Id.*, 705 S.W.2d at 648. We have recently reaffirmed that conclusion in *Federated Stores*. Moreover, although we have not

directly addressed the argument before, we now expressly reject the Commissioner's argument that income generated from asset sales is business earnings if the property was sold for a business purpose, because accepting that argument "would have us hold that the disposition of property is integral to the taxpayer's 'regular' trade or business operations if such a transaction merely arises out of the taxpayer's business operations, however sporadically." *Id.*, 705 S.W.2d at 647-48.

Since we have found that Union Carbide's capital gains from the 1986 divestitures were "nonbusiness earnings" under Tenn.Code Ann. § 67-4-804(a)(5), and since the parties have stipulated that the capital gains could not be "allocated" to Tennessee under Tenn.Code Ann. § 67-4-810 if we found them to be "nonbusiness earnings," we hold that Union Carbide is entitled to a refund of corporate excise taxes in the amount of $925,021.00, plus statutory interest. Accordingly, we affirm the Chancellor's judgment. The costs of this appeal are taxed to the defendant Commissioner of Revenue, and this case is remanded to the Chancery Court for a determination of the reasonable attorneys' fees and litigation expenses to which Union Carbide is entitled under Tenn.Code Ann. § 67-1-1803(d) (1989 & Supp.1992).

REID, C.J., and DROWOTA, O'BRIEN and DAUGHTREY, JJ., concur.