**FIRSTAR CORPORATION, Relator,**

v.

**COMMISSIONER OF REVENUE, Respondent.**

No. CX–97–600.

Supreme Court of Minnesota.

March 12, 1998.

James P. McCarthy, Ann Novacheck, Lindquist & Vennum, P.L.L.P., Minneapolis, for relator.

Hubert H. Humphrey, III, Attorney General, James W. Neher, Assistant Attorney General, St. Paul, for respondent.

Jerome A. Geis, Briggs and Morgan, P.A., St. Paul, and David A. Lawrence, Minneapolis, for amicus curiae Northern States Power Co.

## OPINION

BLATZ, Chief Justice.

In January 1995, the Minnesota Commissioner of Revenue issued an order requiring relator Firstar Corporation (Firstar) to apportion to Minnesota the capital gain it realized from the 1988 sale of office property located in Wisconsin. Firstar appealed this order, claiming the gain it realized constitutes nonbusiness income under Minn.Stat. § 290.17 (1996) and that, therefore, the entire gain is properly assigned to Wisconsin, Firstar's domicile. Firstar argued in the alternative that if the gain represents business income subject to apportionment, taxation of the entire gain violates the United States Constitution's Due Process and Commerce Clauses. In order to fairly reflect the portion of the gain allocable to Minnesota, and to avoid an unconstitutional apportionment, Firstar urged the tax court to apply an alternative apportionment formula under Minn.Stat. § 290.20. The tax court held that the gain was business income subject to apportionment in Minnesota and declined to adopt Firstar's alternative apportionment formula, concluding that the inclusion of the entire gain under Minnesota's apportionment formula fairly reflects Firstar's taxable net income allocable to Minnesota and does not violate the United States Constitution. We conclude that the gain represents nonbusiness income, not subject to apportionment in Minnesota, and accordingly, we reverse.

Firstar Corporation is the registered bank holding company of a group of financial institutions engaged in the business of making loans, taking deposits, and offering various financial services, including equipment leasing, investment management, mortgage lending, and brokerage and trust services. Firstar's headquarters is in Wisconsin. Firstar Milwaukee, a national bank providing commercial and consumer banking services, is a wholly owned subsidiary of Firstar, with its principal office located in Milwaukee. Marshall–Wisconsin is a wholly owned subsidiary of Firstar Milwaukee.

In 1973, Firstar constructed and placed into service the First Wisconsin Tower in downtown Milwaukee, Wisconsin, at a cost of $69 million. The First Wisconsin Tower is a 42–story office building, with two atrium levels. The lower atrium level contains a Firstar Milwaukee branch bank, while the second level, known as the Galleria, is used for retail stores, restaurants, shops, and other retail outlets. Firstar maintained its executive and administrative offices in the First Wisconsin Tower. Except for Firstar Milwaukee, all other Firstar banking subsidiaries maintained executive offices, banking services, and facilities in locations other than the Wisconsin property. Marshall–Wisconsin owned two nearby office buildings, Juneau Square North and South, as well as parking facilities and a gas station. The property owned by Firstar and Marshall–Wisconsin is collectively referred to as the "Wisconsin Property."[1]

In 1986, Firstar and a Trammel Crow affiliate entered into negotiations for the sale and leaseback of the Wisconsin Property. On June 18, 1987, Firstar and Trammel Crow signed a sale agreement for the Wisconsin Property for the sale price of $195,000,000. The actual sale took place on January 7, 1988, pursuant to the terms of the agreement. The sale was one of the largest real estate transactions in the history of Wisconsin and was the largest single real estate transaction in Firstar's history, representing 19.54% of its combined gross receipts for 1988. The sale proceeds were used to retire the bonds secured by the Wisconsin Property, to pay the taxes on the gain from the sale, to pay dividends to shareholders, and to re-

---

1. Since the construction of the First Wisconsin Tower, a majority of the Wisconsin Property was leased to entities unrelated to Firstar, although Firstar and its subsidiaries were the largest affiliated group of occupants. As of the date of both the agreement of sale and the sale, Firstar occupied approximately 31.7% of the Wisconsin Property, based on square footage, and 38.9% of the property, based on a market-rent based allocation.

deploy the capital of Firstar into new acquisitions of banks. The proceeds were not segregated into separate bank accounts.

Before 1987, Firstar did not own or operate any banks outside Wisconsin. However, after the deregulation of interstate banking, effective on January 1, 1987, Firstar acquired banks located in other states, including Minnesota. Firstar acquired Shelard Bancshares, Inc., a bank holding company, in St. Louis Park, Minnesota, on September 3, 1987. Shelard held a total of two banks located in St. Louis Park and Eagan. After the sale of the Wisconsin Property was completed on January 7, 1988, Firstar acquired five additional holding companies in Minnesota throughout 1988.

As a result of its acquisition of Shelard Bancshares, Inc., Firstar filed a single, combined Minnesota corporate franchise tax return for the year ending December 31, 1987. Thus, for the first time, Firstar and its subsidiaries were treated for Minnesota tax filing purposes as a single, unitary business. Firstar's Minnesota receipts for that year totaled $8,514,054 and represented approximately 1% of its total gross receipts of $782,582,780. For the year ending December 31, 1988, Firstar and its subsidiaries' gross receipts in Minnesota totaled $36,920,756, which constituted approximately 3.7% of its total gross receipts of $997,717,302.

Firstar recognized a capital gain of $133,607,016 in 1988, the year of the sale of the Wisconsin Property. Firstar excluded this gain from apportionment to Minnesota on the ground that it was nonbusiness income. On January 23, 1995, the Minnesota Commissioner of Revenue audited Firstar. In addition to other adjustments, the Commissioner determined that the Wisconsin Property gain was business income and therefore factored in the entire gain before apportioning Firstar's income to Minnesota. The percentage of the gain apportioned to Minnesota was approximately 4.5%. Accordingly, Firstar's 1988 apportionable income in Minnesota increased from $19,656,233 to $153,330,669, and its tax liability increased from $82,570 to $643,499. This resulted in a net liability increase of $560,929 plus interest assessed as of January 23, 1995, in the amount of $278,313.30.

■ Firstar contends that the gain realized on the sale of the Wisconsin Property is nonbusiness income, not subject to apportionment in Minnesota. To address this argument, our inquiry begins by examining the relevant portions of Minn.Stat. § 290.17 that outline the tax treatment of business and nonbusiness income. Questions of statutory construction are questions of law and thus are fully reviewable by an appellate court. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn. 1985).

■ Minnesota requires apportionment of income when a taxpayer conducts business in Minnesota and in other states. Minnesota Statutes section 290.17, subd. 3 (1988) provides in pertinent part:

> Trade or business income; general rule. Income derived from carrying on a trade or business must be * * * apportioned between this state and other states and countries under this subdivision if conducted partly within and partly without this state.

However, nonbusiness income is not allocable to Minnesota. Rather it is assigned to the taxpayer's state of domicile, pursuant to Minn.Stat. § 290.17, subds. 2(f) and 6. Subdivision 6 provides:

> For a trade or business for which allocation of income within and without this state is required, if the taxpayer has any income not connected with the trade or business carried on partly within and partly without this state that income must be allocated under subdivision 2.

Subdivision 2 allocates nonbusiness income in pertinent part as follows:

> Income not derived from conduct of a trade or business. The income of a taxpayer subject to the allocation rules that is not derived from the conduct of a trade or business must be assigned in accordance with paragraphs (a) to (f):
>
> * * * * * *
>
> (f) All items of gross income not covered in paragraphs (a) to (e) and not part of the taxpayer's income from a trade or business shall be assigned to the taxpayer's domicile.

No other language in this statute provides further definitional guidelines to distinguish between business and nonbusiness income.

Until 1987, Minn.Stat. § 290.171 contained the definition of business and nonbusiness income provided by the Uniform Division of Income for Tax Purposes Act (UDITPA). Minnesota had adopted UDITPA's apportionment provision as part of a multi-state tax compact in 1983. Act of June 14, 1983, ch. 342, art. 16, § 1, 1983 Minn. Laws 2168, 2339, *codified at* Minn.Stat. § 290.171, Article IV (1986). Article IV contained an optional apportionment formula that taxpayers could elect to use rather than the weighted apportionment formula contained in Minn.Stat. § 290.19 (1986). *See* Minn.Stat. § 290.171, Article III, 1 (1986). Article IV also contained a subdivision that set forth UDITPA's definition of business and nonbusiness income. *Id.* at Article IV, subd. 1(a) and (e). Business income was defined under this statute as:

> income arising from transactions and activity in the regular course of the taxpayer's trade or business, and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.

*Id.,* subd. 1(a). Nonbusiness income was defined as "all income other than business income." *Id.,* subd. 1(e). Only business income was apportionable to Minnesota under this provision.

However, the legislature repealed Article IV in 1987 and enacted § 290.191 containing the current three-factor apportionment formula that taxpayers are required to utilize when apportioning income to Minnesota. *See* Act of May 28, 1987, ch. 268, art. 1, § 74–76, 1987 Minn. Laws 1039, 1098–1120. At this time, the legislature also enacted Minn. Stat. § 290.17, subds. 2(f), 3, and 6, the subdivisions at issue in the present case. *Id.* at 1092–98. This statutory language provides that nonbusiness income is assigned to the taxpayer's domicile, and is not apportionable to Minnesota. Although Minn.Stat. § 290.17 still differentiated between business and nonbusiness income, the legislature enacted no

new section defining business and nonbusiness income to replace the deleted definitional section contained in Article IV. The tax court in the instant case concluded that the repeal of Article IV also resulted in the rejection of UDITPA's definition of business income in Minnesota, stating without any further explanation that "Minnesota has a more expansive definition of apportionable business income."

While the exact UDITPA language defining business and nonbusiness income is no longer part of the statute, the fact that Minn. Stat. § 290.17 still differentiates between the two types of income indicates the legislature's continuing intent to tax only that portion of a taxpayer's income generated from carrying on a trade or business. Upon comparison of the UDITPA definitions of business and nonbusiness income and the language contained in Minn.Stat. § 290.17, subd. 3, we can draw no meaningful distinction between income "arising from transactions and activity in the regular course of the taxpayer's trade or business" and income "derived from carrying on a trade or business." Accordingly, we conclude that Minnesota's current definition of business income is not any more expansive than the definition contained in UDITPA, despite the 1987 repeal of Article IV.

■ Many jurisdictions have analyzed business and nonbusiness income under the UDITPA definitions. While not binding, these decisions do provide some useful factors to consider in our analysis of the gain realized by Firstar. Most jurisdictions interpreting whether a taxpayer's income represents business or nonbusiness income under UDITPA apply one of two tests: a "transactional" test or a "functional" test. A recent case from the Tennessee Supreme Court describes the separate tests, stating that the "controlling factor under the transactional test is the nature of the particular transaction giving rise to the income." *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 92 (Tenn.1993). In contrast, the functional test focuses on whether the "asset produced business income while it was owned by the taxpayer, irregardless [sic] of the extraordinary nature or infrequency of the transaction disposing of the property and giving rise to the gain." *Id.*[2]

---

**2.** *Union Carbide* applied the transactional test,    noting that this test, unlike the functional test,

In *Union Carbide*, a taxpayer liquidated seven lines of business and sold its corporate headquarters building. *Id.* at 90. In holding that the proceeds from the liquidation qualified as nonbusiness income, the court looked at three factors: the frequency and regularity of similar transactions; former business practices; and subsequent use of the proceeds. *Id.* at 92–94. We examine these factors in the context of Firstar's gain. First, addressing both the frequency and regularity of similar transactions and the former business practices of the taxpayer, we note that the sale of the Wisconsin Property was an isolated transaction in Firstar's history. Firstar is in the business of offering a variety of financial services to its customers. Firstar is not in the practice of buying, selling, or developing real estate, and apart from the Wisconsin Property, it had never before sold commercial office property.[3]

■ We next examine Firstar's subsequent use of the sale proceeds. Income not reinvested into the taxpayer's ongoing business operations is nonbusiness income, "outside the scope of the taxpayer's regular course of business." *Union Carbide*, 854 S.W.2d at 93. In the instant case, Firstar used the proceeds to retire the bonds secured by the Wisconsin Property, to pay the taxes on the gain from the sale, to pay dividends to shareholders, and to redeploy the capital of Firstar into acquisitions of new banks. The only subsequent use of the proceeds that arguably could be viewed as a reinvestment in the ongoing business is the acquisition of new banks. However, given the fact that the sale of the Wisconsin Prop-

erty was a once-in-a-corporate-lifetime sale for Firstar, the fact that a portion of the proceeds went to the acquisition of new banks cannot by itself convert the gain into business income.

Moreover, our only decision addressing the concept of nonbusiness income in the context of the disposition of real estate indicates that the acquisition of expansion sites does not result in anything other than a very indirect benefit to a taxpayer's ongoing business activities. *See Target Stores, Inc. v. Commissioner of Revenue*, 309 Minn. 267, 275, 244 N.W.2d 143, 147 (1976). Target is a Minnesota corporation in the business of owning and operating discount stores in Minnesota and other states. *Id.* at 268, 244 N.W.2d at 144. In 1968 and 1969, Target acquired various parcels of land in Texas as sites for its stores. *Id.* at 268–69, 244 N.W.2d at 144. Because several sellers of the land compelled Target to acquire larger parcels than necessary, Target made twelve land sales from the acquired Texas property in the tax years 1970 and 1971. *Id.* Target did not apportion to Minnesota the gains from the sales on the basis that the gains were not derived from Target's trade or business. *Id.*

Although the court in *Target* dealt with a prior version of Minn.Stat. § 290.17, its analysis is not inconsistent with the concept of business income outlined above.[4] In concluding that the gains were not business income, the *Target* court noted that the question was a close one. *Id.* at 274, 244 N.W.2d at 147. The court recognized that the reason for the land acquisition was in "furtherance of the

"ensure[s] that the disposition, as well as the acquisition and management, of the property is an integral part of the taxpayer's regular trade or business operations." *Id.* A decision from the Iowa Supreme Court also considers the transactional test to be more helpful in identifying business income, stating that the Iowa statute provided for use of the functional test only when the transaction involves "disposal of fixed assets by taxpayers who emphasize the trading of assets as an integral part of regular business." *Phillips Petroleum Co. v. Iowa Dept. of Revenue and Fin.*, 511 N.W.2d 608, 610 (Iowa 1993). We agree that the transactional test is more helpful when analyzing whether income "is derived from carrying on a trade or business."

3. We strongly caution, however, that nothing in our decision should be read for the proposition that any gain realized on the sale of property will be classified as nonbusiness income, merely because a taxpayer is not primarily in the business of buying and selling real estate.

4. The version of Minn.Stat. § 290.17 at issue in *Target* provided that "[i]ncome and gains received from tangible property not employed in the business of the recipient of such income or gains" is not apportionable to Minnesota unless such property is located in Minnesota. *Target*, 309 Minn. at 269, 244 N.W.2d at 144–45.

taxpayer's business, i.e., facilitating the acquisition of store sites." *Id.* However, the court concluded that "for property to be employed in the business it must have something more than a minimal relationship to the successful day-to-day operation of the business." *Id.* at 275, 244 N.W.2d at 147. The court determined that "the only relationship of the Texas property to the day-to-day operation of the taxpayer's business is that it permitted Target to acquire expansion sites, a very indirect benefit to the business. Beyond that, it does not appear from the record that the business of operating discount department stores was benefitted." *Id.*

In the instant case, the tax court distinguished *Target,* concluding that the gain realized by Firstar had more than a minimal relationship to its day-to-day operations. We disagree. The sale of the Wisconsin Property was irregular in its nature as well as its scope. In addition to the distinctions set forth above regarding the irregular nature of this transaction, the entire appreciation of the value of the Wisconsin Property, the decision to sell, and the execution of the sale agreement all occurred before Firstar acquired its first bank holding company in Minnesota. These facts strongly support that the acquisition, management, and disposition of the Wisconsin Property was not an integral part of Firstar's ongoing business in Minnesota.

The object of statutory construction "is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (1996). If the capital gain Firstar realized from the sale of the Wisconsin Property meets the definition of business income, we are hard-pressed to think of any situation in which a taxpayer's income would not be classified as business income. Any distinction between business and nonbusiness income the legislature intended by its adoption of Minn.Stat. § 290.17 therefore would be rendered meaningless. We reverse the tax court and hold that the gain realized by Firstar is nonbusiness income, not subject to apportionment in Minnesota. Because we conclude the gain realized by Firstar is nonbusiness income, we need not reach the constitutional issues raised by Firstar.

Reversed.

GILBERT, J., took no part in the consideration or decision of this matter.