IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 15, 2001 Session

DONNA WINSTEAD, DARRELL WINSTEAD, and DANNIE WINSTEAD, The
Surviving children and Next of Kin of ILINE CATHY WINSTEAD, Deceased, by
Their Next Friend and Grandmother, IRENE JOHNSON, v. CLAIBORNE
COUNTY HOSPITAL AND NURSING HOME

**Direct Appeal from the Circuit Court for Claiborne County**
**No. 6875    Hon. Conrad Troutman, Jr., Circuit Judge**

**FILED MARCH 27, 2001**

---

**No. E2000-02214-COA-R3-CV**

---

In this wrongful death action, the Trial Court held that defendant's nurses met the standard of care required of them in the treatment and care of the deceased, and dismissed the case. On appeal, we reverse and enter Judgment for damages.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Circuit Court Reversed.**

HERSCHEL PICKENS FRANKS, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

Mark E. Floyd, Knoxville, Tennessee, for Appellants.

James D. Estep, III, Tazewell, Tennessee, for Appellee.

**OPINION**

In this wrongful death action, the Complaint alleged that the hospital employees failed to properly carry out the orders of the treating physician and failed to properly inform the physician of the patient's condition, that these acts/omissions did not meet the requisite professional standard of care, and resulted in the decedent's death. The hospital denied the allegations, and the case was tried in November, 1998. The Trial Court took the case under submission, and entered final

judgment on July 26, 2000, dismissing the complaint and found that the decedent's care "was within the standards of the hospital" and the "standard of care as given was not deficient nor did this contribute to the death of the patient."

In this non-jury trial, our standard of review is *de novo* with a presumption of correctness of the Trial Court's findings of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *McCarty v. McCarty*, 863 S.W.2d 716,719 (Tenn. Ct. App. 1992). No presumption of correctness attaches to the trial court's legal conclusions. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87 (Tenn. 1993).

Plaintiffs insist that the Trial Court's findings are not supported by the evidence presented. In order to prove their malpractice claim, plaintiffs had the burden of showing the standard of care in the profession and in the community in which the defendant operates, or a similar community, and that defendant acted with less than ordinary and reasonable care in accordance with such standard, and as a proximate result of defendant's negligence, the decedent suffered injuries which would not otherwise have occurred. Tenn. Code Ann. §29-26-115.

The evidence establishes that decedent, a 32 year old female, was admitted to defendant hospital on January 22, 1990 for an elective work-up for complaints of abdominal swelling with no acute distress. After midnight, decedent's condition dramatically worsened and defendant's nursing staff kept in telephone contact with the admitting physician. During the early morning hours and shortly before 5:00 a.m., decedent told the nursing staff that she was going to die, and the evidence establishes that her stomach ruptured around 5:00 a.m. The admitting physician, Dr. Thomas, arrived around 5:30 a.m. and proceeded to perform surgery around 8:15 a.m. The surgery was performed but decedent expired later due to acute respiratory distress syndrome, which was caused by trauma to her lungs from the rupture of the stomach. Dr. Thomas testified that the delay in consenting to surgery was a factor in decedent's death, but he could not say it was greater than 50%. He also opined that the nurses met the standard of care required of them. The nurses on duty that evening were Martha Harrell, an L.P.N. and Dorothy Davis, R.N., the nurse supervisor.

Nurse Davis testified that Nurse Harrell had taken decedent's blood pressure at 3:50 a.m. and recorded it on a worksheet, but must have failed to transfer it to her chart. Nurse Davis stated that she told Dr. Thomas at that time that the decedent's vital signs were stable, but that she was uncomfortable. The nurse later testified that she told Dr. Thomas that decedent was having a "cramping-like pain" in her abdomen, and she went to decedent's room after Nurse Harrell advised her of the decedent's discomfort, and found decedent sitting in a chair and her legs and feet were cold and cyanotic. She further testified that she checked on decedent at 4:30 a.m., and decedent stated that she had no relief from the pain from the pain medication, whereupon the nurse advised Dr. Thomas that decedent complained of gas, and the demerol had not relieved her discomfort. She asked if she could give her an enema. She testified that she did not have the vital signs at that time because she saw no reason to take them. An enema was attempted but was met with blockage of an unknown cause. At that point decedent told Nurse Davis that she was going to die. Around 4:35 a.m. an IV was readied, but was not commenced until 5:00 a.m., after Nurse Harrell detected no blood pressure. Nurse Davis' detailed testimony was that they should take vital signs and write them

in the chart at any time a patient's condition changed, and that she first noticed decedent's abdomen was firm at 3:50 a.m., and that this could mean "nothing good". She further stated that she detected no bowel sounds at that time, and also noticed at that time that the patient's legs were cool and cyanotic, but she did not note that in the chart. She conceded she was required to tell the doctor everything she knew about the patient's condition, but did not tell Dr. Thomas that decedent was short of breath, that her abdomen was firm, and that she heard no bowel sounds. She agreed that the doctor should have been told of the cyanosis in the legs so that he could investigate the cause. The records indicate that Nurse Harrell found decedent's legs to be cool and cyanotic at 4:00 a.m., but Nurse Davis testified that when she went into decedent's room at 4:30, she did not read the chart. Davis did not touch decedent or perform any assessment at 4:30, and admitted that when she called Dr. Davis at 4:30 she told him the patient was still uncomfortable, and she thought an enema might help, but she did not give Dr. Thomas vitals (even though demerol had been administered and it can decrease blood pressure). Also she did not tell him that the abdomen was firm and there were no bowel sounds. She conceded that she should have told the doctor all of these things.

Alice Johnson, R.N., the director of nursing for Claiborne County Hospital, testified that a patient's vital signs should be taken if the patient's condition worsens.

Dr. Howard Reines was called as an expert witness on behalf the plaintiffs, and he stated that he was familiar with and knew the nursing standards in similar communities, that he reviewed the hospital records of decedent, as well as the depositions of Dr. Thomas, Nurse Davis, Nurse Jennings, Nurse Harrell and Nurse Johnson.

Dr. Reines opined that the decedent's death was caused by a stomach rupture and shock related thereto, and that his opinion did not really differ from Dr. Thomas' testimony. Reines testified that when the stomach ruptures, food, acid and bacteria get into the abdominal cavity and cause infection which goes to the bloodstream, and that this causes a drain of fluid from normal places and puts the patient into shock. At that point, the organ systems begin to fail. Dr. Reines testified the decedent could have been saved with appropriate treatment prior to 5:00 a.m., but that it was impossible that she could survive after Dr. Thomas' arrival at 5:30 a.m.

Dr. Reines testified that the record showed that at 3:30 a.m. the decedent's condition was changing because she was short of breath and uncomfortable, and these signs in a 32 year-old were bad. He testified that the standard of care would require an examination and listening to her lungs, taking vital signs and perhaps checking her oxygen saturation. He further testified that the nurses should also check her belly and listen for bowel signs, since that was the problem when she was admitted to the hospital. He further testified that the records demonstrated that none of these things were timely done, which was a breach of the standard of care. Dr. Reines testified that at 3:50 a.m., decedent's abdomen was very distended and firm and she was complaining of real pain, and that Nurse Davis stated in her deposition she had listened for bowel signs and heard none. The witness testified that decedent's vital signs should have been taken at this point, but they were not, and that it was appropriate for the nurse to call the doctor, but she failed to meet her standard of care by only telling the doctor the patient was uncomfortable, and not giving him all the other symptoms.

The doctor stated that Dr. Thomas would have needed all of this information before prescribing demerol, because it can lower blood pressure.

Dr. Reines testified that at 4:00 a.m., decedent's legs and feet were noted to be cool and cyanotic, and that this usually doesn't happen unless a patient's blood pressure is dropping. He opined that the nurses should have take vitals at that point and relayed to Dr. Thomas that her legs and feet were cool and cyanotic. He further opined that the nurses' failure to give this necessary information was a breach of the standard of care.

Dr. Reines testified that at 4:30 a.m., the nurses still did not give Dr. Thomas the correct information, and that an enema was not an appropriate treatment, given all the decedent's symptoms.

Dr. Reines was of the opinion that decedent's stomach rupture probably occurred around 5:00 a.m., and that the significant deviations from the standard of care by the nurses brought on decedent's demise. He testified that decedent could have been given IV fluids and an NG tube to drain her stomach before 5:00 a.m. and this would have most probably prevented the rupture, and hence no need for the subsequent surgery. He opined with a reasonable degree of medical certainty, that it was more likely than not that decedent's death was caused by the delay in initiating therapy, because the nurses did not give the doctor full and proper information. He also testified that the delay in consenting to surgery did not contribute to her death, because after 5:00 a.m., she could not be saved.

Plaintiffs also called Charlene LeMay, R.N., as an expert witness who lives in Knoxville and is a professor of nursing at Roane State Community College. She gave detailed testimony of the omissions of the nurses in reporting the patient's condition to the doctor, which she concluded were a violation of the standards for nurses in that community.

Based upon the evidence, we conclude there is a clear preponderance of evidence supporting the plaintiffs' theory that defendant's nurses breached the standard of care in failing to adequately assess and report decedent's condition to the treating physician, so that proper and timely treatment could have been given. All of the witnesses agree that the standard of care requires patients to be assessed and the doctor notified of any changes in condition. Further, all the witnesses agree that there were important changes in decedent's condition which should have been reported to the doctor, but were not. Defendant's experts' testimony is contradictory and does not support the judgment for defendants. On the one hand, they opine the nurses met the standard of care, but on the other, concede that significant changes occurred in decedent's condition which were either not detected or timely reported to the doctor.

We find this breach of the standard of care was the proximate cause of decedent's death. Dr. Reines opined that it was more probable than not that decedent would have survived if treatment had been initiated sooner, and Dr. Thomas basically admitted that treatment would have been initiated sooner if he had understood the gravity of decedent's condition. Dr. Reines testified

that plaintiff had almost no chance of survival after her stomach ruptured, and the evidence supports the finding that more likely than not the nurses' breach of their standard of care caused decedent's injuries and death. See *Kilpatrick v. Bryant*, 868 S.W.2d 594 (Tenn. 1993).

Both parties agree that recovery in this case is capped at $130,000.00, based upon the Tennessee Governmental Tort Liability Act, which is codified at Tenn. Code Ann. §29-20-101 *et seq.* Plaintiffs introduced evidence of decedent's funeral expenses, her life expectancy, pain and suffering and other elements of damages. The evidence in the record would support a judgment in excess of $130,000.00, but for the cap.

We reverse the judgment of the Trial Court and remand for the entry of a judgment in the amount of $130,000.00 for plaintiffs. The cost of the cause are assessed to defendant hospital.

_____
HERSCHEL PICKENS FRANKS, J.