# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## RAYMOND DAVIS v. CITY OF CLARKSVILLE

**Direct Appeal from the Circuit Court for Montgomery County**
**No. C11-409, James E. Walton, Judge**

---

### No. M1999-00084-COA-R3-CV - Decided July 7, 2000

---

This is a negligence suit under the Tennessee Governmental Tort Liability Act. The plaintiff is a city police officer who was injured while rushing an armed robbery suspect. The plaintiff rushed the robbery suspect when he moved from a position of cover to a position closer to the suspect, after his supervisor motioned him to move forward. The plaintiff sued the city, alleging that his injuries were caused by his supervisor's negligence. The trial court found that the supervisor was negligent and awarded the plaintiff $45,000 in damages. The city appeals. We reverse, finding that the evidence does not support a finding that the supervisor was negligent.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Reversed.**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

W. Timothy Harvey, Clarksville, Tennessee for the Appellant, City of Clarksville.

Stacy A. Turner, Clarksville, Tennessee, for the Appellee, Raymond Davis.

### OPINION

This negligence suit under the Tennessee Governmental Tort Liability Act was brought by City of Clarksville police patrolman Raymond Davis ("Davis"), against the City of Clarksville ("City"), to recover for injuries Davis received when he broke his leg in an attempt to apprehend an armed robbery suspect. On December 28, 1995, Davis was on patrol duty. He received a call that an armed robbery was in process at a laundromat on Highway 41-A in Clarksville. En route to respond to the call, Davis encountered his supervisor, Sergeant Gary Hurst ("Sgt. Hurst" or "Hurst"), the officer in charge of the shift. Hurst had received information that the suspect had fled the laundromat. Sgt. Hurst told Davis to search for the suspect along Birch Road. Davis then heard Sergeant John Hunt ("Sgt. Hunt") of the Clarksville Police Department announce over the radio that shots had been fired at the Car Market, a Clarksville used car dealership located on Highway 41-A. Davis immediately drove to the Car Market. When he arrived, Davis first placed a civilian in the back of his police cruiser for safety. He then cautiously began to move toward the area of the dealership lot, near the dealership building, where Sgt. Hunt and the armed suspect were located,

eventually coming to a stop behind a large pink statue of an elephant located on a trailer on the car lot. From his position of cover behind the elephant statue, Davis could see the suspect, on his knees in the parking lot, with a pistol placed against his head. He could also hear Sgt. Hunt talking with the suspect. Since Sgt. Hunt was conversing with the suspect, he did not speak to Davis and Davis did not speak to Hunt.

From his position of cover, Davis watched Sgt. Hurst arrive and park his car in an adjacent parking lot, remove a rifle from the trunk, and begin to move towards the suspect. As Sgt. Hurst moved forward, he made a hand gesture to Davis. Davis was uncertain of the meaning of Hurst's gesture, but interpreted it as a signal to move forward. Davis then left the cover of the elephant statue in order to follow Sgt. Hurst to a position behind a parked truck, several feet in front of the statue. At the time, the suspect's back was turned to both Sgt. Hurst and Davis. When Davis moved from behind the elephant statue, however, the suspect apparently heard the movement behind him. The suspect rose and turned toward Davis, with the gun pointed at him. When Davis saw the suspect turn with the gun pointed at him, Davis decided to charge and execute a "flying kick" on the suspect, in an attempt to knock him off his feet and to avoid being shot. Sgt. Hurst saw the suspect turn with his gun toward Davis, saw Davis charge the suspect, and believed that Davis was about to be shot. Sgt. Hurst then raised and fired his rifle at the suspect, hitting him in the shoulder. Davis fell to the ground with the suspect and suffered a broken leg. Although Davis initially believed that he had been hit by a bullet, fired either by Sgt. Hurst or the suspect, the surgeon who repaired the break found no indication that Davis had been shot.

On March 5, 1996, Davis filed a lawsuit against Sgt. Hurst and the City of Clarksville, seeking $300,000 for damages suffered in the encounter with the armed suspect. Davis alleged that his injuries had been caused by Sgt. Hurst's negligence in placing Davis in a dangerous position and in firing his weapon while Davis was charging the suspect. On April 1, 1996, Davis filed a notice of voluntary dismissal of the action against Sgt. Hurst, leaving only his claim against the City, based on the negligence of its employee, Sgt. Hurst. In its answer, the City denied that Sgt. Hurst had been negligent, or that Hurst's actions were the proximate cause of Davis' injury, asserted that Davis had been negligent in charging the armed suspect, and also asserted that Davis' injury was the result of the intervening criminal action of the third party armed robbery suspect.

The City filed a motion for summary judgment. The City argued that it was entitled to judgment as a matter of law on Davis' claim, based on application of the "policemen and firemen's rule," which "precludes negligence actions by firemen and policemen who are injured by a risk peculiar to their employment." *Carson v. Headrick*, 900 S.W.2d 685, 687 (Tenn. 1995). The trial court granted the City's motion for summary judgment, finding that the firemen and policemen's rule barred Davis' suit. Shortly after this ruling, however, this Court held, in *Bridges v. City of Memphis*, 952 S.W.2d 841, 848 (Tenn. Ct. App. 1997), that the policy behind the firemen and policemen's rule would not be frustrated by allowing firemen or policemen to sue governmental entities for negligence. Based on the holding in *Bridges*, the trial court reconsidered and ultimately denied the City's motion for summary judgement.

A bench trial was held on January 15, 1999. Sgt. Steve Poston ("Sgt. Poston") and Captain Bob Davis ("Capt. Davis") of the Clarksville City Police Department, testified regarding the investigation of the "shooting team" assembled to investigate the incident at the Car Market. Capt. Davis testified that a "shooting team" is routinely assembled anytime a person is shot, for the purpose of critiquing the actions of each officer involved in the incident. Capt. Davis and Sgt. Poston were members of the shooting team that investigated the incident at issue. Capt. Davis testified that the team interviewed all officers involved. The team's taped interview of Sgt. Hurst was introduced into evidence. Capt. Davis stated that, at the conclusion of the investigation, the shooting team issued a report on each officer involved in the incident, including Sgt. Hurst, Sgt. Hunt, and Officer Davis. These reports were also introduced into evidence.

Sgt. Poston testified that each officer's actions were evaluated, in part, in light of the established policies of the Clarksville Police Department, including General Orders A-10 on the use of force/firearms, General Orders E-2 on actions by the tact team, and General Orders E-20 on hostage/barricade situation responses. These policy statements were introduced into evidence. General Order E-20 states in part:

> Patrol responsibilities: No. 1, take up positions of covered concealment. Members shall fire only at a visible target which is at the moment presenting an immediate danger to human life. Members shall fire only when innocent persons or other officers will not be jeopardized.

Other relevant portions of the statements indicated that the first officer who arrives upon the scene of a "hostage type" situation should assume command until relieved of command by a higher ranking officer, that each officer who subsequently arrives is to report to the officer in charge, and that hostage negotiation personnel should, when possible, be given the opportunity to perform their functions. Both Sgt. Poston and Capt. Davis testified, however, that the policy statements were intended only as general guidelines, not absolute rules. Capt. Davis testified that each police officer is expected to make judgement calls at "any given time at any given scene." In addition, a memorandum issued by the Clarksville City Police Chief in connection with the Policy Statements was introduced into evidence. It states:

> In the following pages of this manual, as well as the other manuals produced by the Clarksville Police Department, it has been attempted to construct guidelines for personnel to use in making decisions. Every General Order has been written as thoroughly and precisely as is possible without tieing [sic] the hands of the Law Enforcement Officer. It is the desire of the Administration of this department that each employee learn and utilize these orders so that the citizens Clarksville [sic] can be better served and to promote a better understanding between the different units of the Department.
>
> It must be pointed out, however, that this manual is not all inclusive. Due to the extremely large range of situations that a Police Officer encounters, this is both impossible and impracticable. The Orders in this manual must be applied, based on the situation as well as the training and good judgment of the Police Officer. No

manual, neither this one or [sic] any other, can make the final decision for the Police Officer in every situation you will encounter.

So with this in mind, it is hoped that all Police Department employees will take this manual and use it as a tool to further their professionalism as well as the professionalism of this Department.

The shooting team's report on Sgt. Hurst was also introduced into evidence. It states:

The shooting team feels the following problems happened.
1. Fail to communicate with the first officer on the scene.
2. Was the weapon choice correct.
3. Was Sgt. Hurst close enough to Davis to tell him what to do verses [sic] giving him hand signals.
4. What was the hurry to rush this person.
5. Why did he not allow the negotiator to do her job, since he was the one that called her.
6. Did he know if the building had people in it or not before firing a weapon that could go through it.
7. Since he knew that Sgt. Hunt was on the lot somewhere, should he have first tried to locate him.
8. Why could he not hear Sgt. Hunt talking to the w/m.

Captain Davis stated that Sgt. Hurst had received no discipline, reprimand or "negative marks" on his record as a result of the incident.

The plaintiff, Raymond Davis, testified that, from the position he had taken behind the elephant statue, he watched Sgt. Hurst arrive at the scene, remove a rifle from his trunk, and move towards the suspect. When Sgt. Hurst turned toward Davis, he made a sideways motion with his hand. Davis testified that he did not understand what Sgt. Hurst meant by the hand gesture, but that he interpreted it as a signal to move forward, assuming that "maybe he [Sgt. Hurst] wanted me to go to the truck." The amount of radio traffic going on at the time prevented Davis from contacting Hurst by radio to determine exactly what Hurst wanted him to do. Davis acknowledged that the heavy radio traffic also would have prevented Sgt. Hurst from contacting him. Davis came out from behind the elephant statue and saw the suspect turn towards him. Davis then made the split second decision to charge the suspect, rather than to continue to move toward the truck that Sgt. Hurst was behind.

Sgt. Hunt testified as well. When asked whether he issued any instructions to Sgt. Hurst, or called for a hostage negotiator, Sgt. Hunt stated that he had been too busy talking to the suspect to get on the radio. He testified that "I wasn't in a position at that time to talk on the radio and instruct this individual who was using deadly force as far as myself, a threat towards me and myself, I didn't have time to talk to--" There was no testimony that Sgt. Hunt issued commands to anyone on the scene.

-4-

Sgt. Hurst testified that, by moving forward toward the suspect, he had been following established police training and protocol that calls for the formation of a perimeter around an armed suspect. The purpose of forming a perimeter, he said, is "to contain any suspects, to locate and identify witnesses, to locate and identify suspects, to attempt to apprehend the suspect when the time is right." Sgt. Hurst testified that it was within police policy and training to gradually move closer to the suspect, in an attempt to close the perimeter. Sgt. Hurst also testified that motioning Davis to move forward with him to the parked truck was done in order to form a perimeter. Sgt. Hurst tried to contact Davis on the radio when he arrived at the scene, but had been unable to get through because of the heavy radio traffic at the time. Sgt. Hurst testified that he intended for Davis to move to a position of cover closer to the suspect, but did not intend for him to attack the suspect. He was surprised when Davis began to charge the suspect. Sgt. Hurst fired his rifle at the suspect when he saw the suspect turn towards Davis with his gun hand raised as if to shoot Davis.

At the conclusion of the trial, the trial court found that Sgt. Hurst had been negligent and that his negligence was the proximate cause of Davis' injuries. The trial court found that Davis had not been negligent. Accordingly, judgment was entered against the City for Davis, and he was awarded $45,000 in damages. From this entry of judgment, the City now appeals.

The City raises four issues on appeal. The City first argues that the policemen and firemen's rule precludes Davis' recovery against the City for the non-intentional conduct of a fellow employee while in the course and scope of his employment. The City also argues that the trial court erred in finding that Sgt. Hurst was negligent, in finding that Davis was not negligent, and in finding that the negligence, if any, of Sgt. Hurst was the proximate cause of Davis' injuries.

Our review of this case is governed by Tennessee Rule of Appellate Procedure 13(d), which provides that review of findings of fact by the trial court shall be *de novo* upon the record of the trial court, accompanied by a presumption of correctness of the factual findings, unless the evidence preponderates otherwise. T.R.A.P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

We address first the issue of whether the trial court erred in finding that Sgt. Hurst was negligent. The portion of the trial court's order addressing this issue, entitled "Was Sergeant Hurst at fault?" states:

> The plaintiff alleges that Sergeant Hurst was negligent and that his negligence was the legal and factual cause of the plaintiff's injuries. The plaintiff says that Sergeant Hurst was negligent because (1) he shot the plaintiff, and (2) he did not follow established police department procedure.
>
> It was first thought that the plaintiff had suffered a gun shot wound. However, Dr. Cooper Beasley, the physician who operated on plaintiffs [sic] leg, said the injury was not from a gun shot. Mr. William S. Best, a forensic chemist, found traces of gun powder and bullet fragments in the plaintiff's sock. Dr. Richard Fishbein, an orthopedic surgeon who examined the plaintiff, said that the injury was

consistent with the plaintiff having been struck a glancing blow by a bullet. On this issue, Dr. Beasley is the more credible witness. The plaintiff has not carried the burden of proof to establish by a preponderance of the evidence that a bullet fired by Sergeant Hurst struck him.

The plaintiff alleges that Sergeant Hurst violated established police policy in the following ways:

1.     by taking control of the operation when Sergeant Hunt, an officer of equal rank, was first on the scene and had been talking with the suspect for approximately 20 minutes before Sergeant Hurst arrived.

2.     Directing the plaintiff forward, into an unprotected position, when the suspect had a weapon.

3.     Firing his rifle at the suspect when the plaintiff was so near the suspect as to put the plaintiff in danger.

4.     For failing to have voice communication with the officer in charge at the scene and with the plaintiff.

The defendant denies that Sergeant Hurst was negligent, but says the plaintiff was negligent for following the command of Sergeant Hurst.

Sergeant Hunt was in charge when Sergeant Hurst arrived on the scene. All other officers were carrying out their responsibilities to support the operation as directed by Sergeant Hunt. Sergeant Hunt felt that he was establishing a rapport with the suspect, that time was on their (police) side and that the suspect might drop the pistol. Sergeant Hunt did not know that Sergeant Hurst had arrived on the scene. He could not know that Sergeant Hurst was proceeding with his own plan to apprehend the suspect. Sergeant Hunt was astonished when the plaintiff rushed the suspect and Sergeant Hurst fired a shot.

Clearly, Sergeant Hurst did not communicate with Sergeant Hunt at the scene, by radio or by any other means.

The plaintiff was injured after he moved from behind cover as directed by Sergeant Hurst. Sergeant Hurst intended for the hand signal to be a command to the plaintiff to move closer to the suspect and behind the truck where Sergeant Hurst was located. This meant that the plaintiff must move from a position of cover through an unprotected area, to the truck. The plaintiff did not understand exactly what Sergeant Hurst wanted him to do or where he wanted him to go. However, the plaintiff understood he had received an order from a superior officer and that he must follow the order. Once the plaintiff moved into the open, all of the above described events took place very quickly.

The duties of a police officer involve great danger. This was a dangerous situation. Given all the evidence, Sergeant Hurst violated several police department policies. When he arrived at the scene and interfered with the operation being conducted by Sergeant Hunt, he placed all other officers in danger. In this, Sergeant Hurst was negligent. When he directed the plaintiff to move from a position of safety to one of immediate danger, under the circumstances then present, Sergeant Hurst was negligent. Except for the negligent actions of Sergeant Hurst, the plaintiff would

-6-

not have been injured. The negligence of Sergeant Hurst was the legal cause, and the cause in fact, of the plaintiff's injury.

The City argues that there was no evidence that Hurst's conduct fell below the standard of reasonable care under the circumstances as they existed at the time. It argues that the actions of Sgt. Hurst upon which the findings of negligence are based, namely, Hurst's failure to communicate with Sgt. Hunt and his use of a hand gesture to motion Davis forward, do not constitute negligence on the part of Sgt. Hurst. The City points out that the evidence presented at trial indicated that communication was extremely difficult, if not impossible, due to the heavy radio traffic. The City also notes Davis' admission at trial that, although he was confused by Sgt. Hurst's hand signal, he did not interpret it as a command to rush the suspect. The City argues that even though Sgt. Hurst's chosen course of action may not have been the best one, judged with the benefit of hindsight, his conduct, given the stresses and exigencies of the situation at the time he acted, simply does not rise to the level of negligence.

Consequently, we must examine the evidence on which the trial court based its finding that Sgt. Hurst was negligent. The trial court found that Sgt. Hurst was negligent in failing to communicate with Sgt. Hunt when he arrived at the scene and in taking actions not directed by Sgt. Hunt. It also concluded that Sgt. Hurst was negligent in directing Davis to move from his position of cover. These findings were based on the Clarksville City Police Policy Statements and the report of the shooting team. The only expert testimony on whether Sgt. Hurst's actions violated the applicable standard was Sgt. Hurst's own testimony that his actions comported with established police procedures.

The Clarksville City Police Policy Statements indicate that the first officer who arrives on the scene, in this case Sgt. Hunt, should assume command, and that officers who arrive subsequently, such as Sgt. Hurst, should report to the officer in charge, Sgt. Hunt. The Policy Statements also indicate that officers should "take up positions of covered concealment." However, the testimony of Sgt. Poston and Capt. Davis is undisputed that the Policy Statements were intended only as general guidelines, and that each police officer is expected to make a judgment call in the given circumstances at the time. This is corroborated by the memorandum issued by the Clarksville City Police Chief in connection with the Policy Statements. There was no testimony, expert or otherwise, that Sgt. Hurst's failure to communicate with Sgt. Hunt when he arrived at the scene, and his directive to Davis to move forward, violated the applicable standard of conduct under these circumstances at this time. Indeed, the testimony is undisputed that communication with Sgt. Hunt was not possible, and that Davis did not do so when he arrived for the same reason. Moreover, the Policy Statements, since they are general guidelines only, do not contradict Sgt. Hurst's testimony that, under the circumstances presented in this case, police standards called for him to establish a perimeter around the suspect, and that ordering Davis to move forward in order to form such a perimeter was consistent with standard procedure.

Davis also points to the report of the shooting team, which was also introduced into evidence. The report states that the shooting team "feels the following problems happened," and notes that Sgt. Hurst failed "to communicate with the first officer on the scene." It questioned whether Sgt. Hurst

was "close enough to Davis to tell him what to do" instead of relying on hand signals. However, Capt. Davis' testimony was undisputed that the shooting team report merely raised questions about Sgt. Hurst's actions and that Sgt. Hurst was neither disciplined nor reprimanded for his actions. This is consistent with the language used in the shooting team report, which appears to raise issues and point to "problems" but does not reach conclusions on whether the officers being critiqued were negligent. Under these circumstances, the report of the shooting team is not sufficient evidence upon which to base a finding that Sgt. Hurst was negligent.

Therefore, the Policy Statements are insufficient evidence of Sgt. Hurst's negligence because they are general guidelines only and do not establish that Sgt. Hurst's actions violated accepted police standards under these circumstances. The report of the shooting team is insufficient evidence because it only raises questions regarding Sgt. Hurst's actions and reaches no conclusion that his conduct violated accepted police standards. Indeed, the only testimony regarding whether Sgt. Hurst's actions violated accepted police standards under the exigencies of this situation is Sgt. Hurst's testimony that his actions comported with police training and protocol. Under these circumstances, we must conclude that the evidence is insufficient to support a finding that Sgt. Hurst was negligent. This holding pretermits consideration of the other issues raised on appeal.

The decision of the trial court is reversed, and judgment is entered for the Appellant, City of Clarksville. Costs on appeal are taxed against the Appellee, Raymond Davis, for which execution may issue, if necessary.

**HOLLY KIRBY LILLARD, J.**
**W. FRANK CRAWFORD, P. J., W.S.**
**DAVID R. FARMER, J.**