IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 17, 2017 Session

IN RE KIRA D., ET AL.[1]

**Appeal from the Chancery Court for Hawkins County**
**No. 2015-AD-41      Douglas T. Jenkins, Chancellor**

_____

**No. E2017-00545-COA-R3-PT**
_____

This appeal involves the filing of a termination petition by the mother and stepfather against the father of two minor children. The court denied the termination petition but appointed the stepfather as the permanent guardian of the children. The father appeals. We vacate the order of permanent guardianship.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Vacated; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J. and THOMAS R. FRIERSON, II, J., joined.

Amy Kathleen Skelton and Whitney Bailey, Rogersville, Tennessee, for the appellant, Jerry W. D.

Daniel G. Boyd, Rogersville, Tennessee, for the appellee, Jeremy A. J.

**OPINION**

## I.      BACKGROUND

Kira and Keatan D. (collectively "the Children") were born of the marriage between Amanda J. ("Mother") and Jerry D. ("Father") in November 2003 and May 2008, respectively. Mother and Father were divorced by order of the court, entered on July 6, 2013, pursuant to a marital dissolution agreement with an agreed upon parenting plan. Pursuant to the agreement, Mother was identified as the primary residential parent,

_____

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

while Father was awarded reasonable visitation and tasked with remitting child support in the amount of $457 per month.

Mother married Jeremy J. ("Stepfather") on February 7, 2014. The Children have resided with Mother and Stepfather since that time. Mother was diagnosed with terminal cancer, namely Stage 4 Adenocarcinoma, months later. Thereafter, Mother and Stepfather filed a petition to terminate Father's parental rights on November 30, 2015, alleging abandonment for failure to visit and to support. Father denied the allegations, claiming that he did not pursue visitation in an effort to maximize the Children's time with Mother before her passing. He stated that he remained in contact with them and was available, if needed. He conceded that he failed to remit support during the relevant time period but claimed that he believed the support payments had been deducted from his paycheck. He asserted that he remedied the issue. He sought custody of the Children in light of the severity of Mother's illness.

The case proceeded to a hearing on December 19, 2016, at which several witnesses testified. Mother confirmed her illness and explained that her remaining time was uncertain. She claimed that Father had not visited the Children or provided child support in the four months preceding the filing of the termination petition, namely July 30 through November 29, 2015. Relative to visitation, she testified that he was entitled to co-parenting time pursuant to the parenting plan. She noted that he agreed to a co-parenting schedule consisting of every other weekend during the school year and every other week during the summer. She asserted that Father never called or attempted to schedule visitation during the relevant time period. She acknowledged that Father may have been present at a wedding on September 5 that the Children attended but claimed that any interaction was not scheduled by him or arranged in advance. She agreed that he also spoke with Kira through text messages. She explained that his communications were vague expressions of love and concern and that he did not even celebrate Kira's birthday with her on November 7. She further claimed that he also had not attended the Children's extracurricular activities or school functions since the time of the divorce. She denied that Father ever advised her that he was not pursuing visitation with the Children in an effort to maximize her time with them before her passing.

Relative to child support, Mother testified that she did not receive any support payments pursuant to the parenting plan during the relevant time period, whether token or otherwise. She identified his summary of payments through the Child Support Enforcement Services that confirmed her claim. She agreed that he had remitted support in the total amount of approximately $14,642 from September 30, 2013, through December 5, 2016.

Mother described a loving relationship between the Children and Stepfather and claimed that he became the father that they needed. He provided for them financially and emotionally, participated in their activities, and took them to and from school. She questioned Father's ability to care for the Children financially and provided that he was simply unable to provide them with the stability they would need once she was no longer living. She agreed that Father was present in the Children's lives since their birth and in the years prior to their divorce. She explained that he served as a father figure prior to the divorce but claimed that he no longer has a relationship with them. She acknowledged that the Children maintained a relationship with Father's stepmother, who visited with the Children approximately once every six months.

Stepfather testified that he spoke with Father on one occasion during the relevant time period. He explained that he saw him in a parking lot and asked, "Where in the world have you been?" Father told him that he had been working. He stated that Father retrieved the Children the next day and exercised co-parenting time for approximately four hours. He agreed that Father was also present at a wedding the Children attended. He confirmed that Father did not remit child support during the relevant time period.

Stepfather described a loving relationship between himself and the Children and identified several pictures of him with the girls doing various activities. He claimed that he was willing to provide for them financially and emotionally and to serve as their father. He provided that the Children enjoyed a healthy relationship with his family and considered his family as part of their family.

Stepfather testified that Father's involvement with the Children has been "sporadic" and never by any set schedule. He noted that Father also did not attend extracurricular activities. He stated that Father's participation with the Children declined prior to Mother's diagnosis. However, he agreed that Father assisted with the Children on at least one occasion when Mother was in the hospital at the time of her diagnosis.

Kira, who was 13 years old at the time of the hearing, testified outside of the presence of her parents and Stepfather. She described a loving relationship with Stepfather and expressed a desire to remain with him. She also stated that she would like to maintain a relationship with Father, if possible.

Father testified that he exercised his co-parenting time prior to Mother's diagnosis but that after her diagnosis, he advised the Children and Mother that he would forego visitation in an attempt to allow them to maximize their time with her before her passing. He identified text messages between himself and Kira in which he expressed his love and concern for her and Keatan and even asked if they would like to visit with him in August 2015. He noted that Kira rejected his offer, claiming that she had plans to attend a

sleepover. He stated that his attempts to schedule visitation were repeatedly rebuffed because they had events planned each time he attempted to visit. He claimed that despite this fact, he visited them at school and saw them at a wedding in September 2015.

Father agreed that Stepfather had been an appropriate role model for the Children and stated that he approved of his relationship with them. He claimed that he provided cash for the Children on occasion during the relevant time period.[2] He stated that he was unaware that his child support payments were not deducted from his paycheck during the relevant time period and that he did not learn of his arrearage until his license was revoked for failure to remit payment. He claimed that his license had since been reinstated; however, his claim was proved false by a record check performed by court personnel during the hearing. He admitted that he was terminated from his employment with the Sheriff's office in 2012 for misbehavior and that he also pled guilty to misdemeanor perjury in 2014.[3]

Jerry D. ("Grandfather"), the paternal grandfather, and Linda D., the paternal great aunt, testified that their interaction with the Children had decreased in recent years. They expressed a desire to spend more time with them as a family.

Following the hearing, the court denied the termination petition, by order entered on February 14, 2017, finding that Father had not willfully abandoned the Children by his failure to visit or to remit support, despite the current support arrearage. The court specifically found Father's testimony credible that he did not pursue visitation in an effort to maximize the Children's time with Mother before her passing. However, the court found that it was in the best interest of the Children to award Stepfather permanent guardianship and physical custody of the Children. The court stated as follows:

> [T]his matter presents a delicate issue involving possible last wishes of [Mother] for [the Children] to remain with [Stepfather] so he may raise them. While the Court acknowledges that [Stepfather] and [the Children] have an excellent and loving step parent/child relationship, the Court must look at what is in the best interest of [the Children]. Termination of [Father's] parental rights is not in their best interest, as it would sever lasting bonds that they have with their father – who may soon be their only surviving biological parent. However, in keeping with [Mother's] wishes, the Court alternatively believes that it has the jurisdiction and the ability to

---

[2] Kira denied this fact.

[3] Jeffrey Feathers testified that he worked with Father approximately ten years ago while employed by Fluor Daniel as a contractor in a supervisory capacity. He confirmed that Father never received a disciplinary report to his knowledge.

order that permanent guardianship be set up between [Stepfather] and [the Children] such that [Stepfather] can remain involved in their care and custody should [Mother] not recover from her present illness.

Mother died on March 3, 2017. Father then filed this timely appeal, disputing the creation of a permanent guardianship.

## II.    ISSUE

The sole issue on appeal is whether the court erred in its creation of a permanent guardianship following the denial of the termination petition.

## III.    STANDARD OF REVIEW

This case presents an issue of law, which we review de novo with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

## IV.    DISCUSSION

Father claims that the court was without authority to enter an order of guardianship after denying the termination petition. He alternatively claims that even if the court held the requisite authority, the court failed to follow the necessary steps in making such a designation. Stepfather, who does not appeal the denial of the termination petition, claims that the court erred in crediting Father's testimony after having been presented with specific instances of Father's untruthfulness. Stepfather further claims that the court did not err in designating him as the permanent guardian and that the designation of guardianship supersedes any prior order of custody, including any rights provided for in the permanent parenting plan. Father issues a reply brief in which he responds that the court did not err in crediting his testimony when the cited instances of untruthfulness had no bearing on the grounds for termination.

The court's credibility determination has no bearing on the issue before this court, namely whether the trial court held the requisite authority to designate Stepfather as the Children's permanent guardian after denying the termination petition. Tennessee Code Annotated section 36-1-113(a)[4] gives the chancery and circuit courts concurrent jurisdiction with the juvenile court to consider a termination petition. The court

---

[4] "The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4."

considering the petition also possesses the authority to enter an order of guardianship pursuant to Section 36-1-113(m), which provides, in pertinent part, as follows:

> *Upon termination of parental or guardian rights*, the court may award guardianship or partial guardianship to any prospective adoptive parent or parents with the right to adopt the child, or to any permanent guardian who has been appointed pursuant to title 37, chapter 1, part 8. In any of these cases, such guardianship is subject to the remaining rights, if any, of any other parent or guardian of the child.

(Emphasis added.). "There is no provision giving the court authority [to designate a permanent guardian] if the termination petition is denied." *See generally State v. R.S.*, No. M2002-00919-COA-R3-CV, 2003 WL 22098035, at \*19 (Tenn. Ct. App. Sep. 11, 2003) (holding that jurisdiction reverted back to the juvenile court once the circuit court denied the termination petition).

While the court in this case retains jurisdiction over custody matters, only the juvenile court possess the requisite authority to appoint a permanent guardian if the termination petition is denied. Tenn. Code Ann. § 37-1-801 ("The juvenile courts of Tennessee are empowered to appoint an individual a permanent guardian; provided, that the individual qualifies under the provisions of this part."). Such appointments are subject to the following provisions of Section 37-1-802:

> (b) The court may issue a permanent guardianship order only if the court finds that:
>> (1) The child has been previously adjudicated dependent and neglected, unruly or delinquent;
>> (2) The child has been living with the proposed permanent guardian for at least six (6) months;
>> (3) The permanent guardianship is in the child's best interests;
>> (4) Reunification of the parent and child is not in the child's best interests; and
>> (5) The proposed permanent guardian:
>>> (A) Is emotionally, mentally, physically and financially suitable to become the permanent guardian;
>>> (B) Is suitable and able to provide a safe and permanent home for the child;

(C) Has expressly committed to remain the permanent guardian for the duration of the child's minority;
(D) Has expressly demonstrated a clear understanding of the financial implications of becoming a permanent guardian, including an understanding of any potential resulting loss of state or federal benefits or other assistance; and
(E) Will comply with all terms of any court order to provide the child's parent with visitation, contact or information.[5]

Even if the court in this case held the authority to designate Stepfather as the permanent guardian, it did not issue the requisite findings in support of its order of guardianship. Accordingly, we vacate the order of guardianship and remand for a determination of custody in light of Mother's passing pursuant to Section 36-1-106(a)(1).[6]

## V.     CONCLUSION

The trial court's order of guardianship is vacated, and the case is remanded for further proceedings in accordance with this opinion. Costs of the appeal are taxed to the appellee, Jeremy A. J.

_____
JOHN W. McCLARTY, JUDGE

---

[5] A parent may also voluntarily consent to an order of permanent guardianship. Tenn. Code Ann. § 37-1-802(f) ("The parent may voluntarily consent to the permanent guardianship, and shall demonstrate an understanding of the implications and obligations of such consent prior to the court entering an order establishing a permanent guardianship in accordance with the provisions of this part.").

[6] "In a suit for annulment, divorce or separate maintenance, where the custody of a minor child or minor children is a question, the court may . . . award the care, custody and control of such child or children to either of the parties to the suit or to both parties in the instance of joint custody or shared parenting, *or to some suitable person, as the welfare and interest of the child or children may demand*, and the court may decree that suitable support be made by the natural parents or those who stand in the place of the natural parents by adoption. *Such decree shall remain within the control of the court and be subject to such changes or modification as the exigencies of the case may require*." (Emphasis added.).