# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

ROSIE JOHNSON, Administratrix of )
the ESTATE OF CLYDE JOHNSON, )
Deceased, )
)
    Plaintiff/Appellant, ) Shelby Chancery No. 107964-3
)
v. )
)
DELIA AVERY, ) Appeal No. 02A01-9803-CV-00079
)
    Defendant/Appellee. )

**FILED**

**June 22, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

## APPEAL FROM THE CHANCERY COURT OF SHELBY COUNTY
## AT MEMPHIS, TENNESSEE

### THE HONORABLE D. J. ALISSANDRATOS, CHANCELLOR

For the Plaintiff/Appellant:

Richard F. Vaughn
Memphis, Tennessee

For the Defendant/Appellee:

Charles M. Holt
Memphis, Tennessee

**AFFIRMED**

HOLLY KIRBY LILLARD, J.

CONCUR:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

**OPINION**

This case involves an action to set aside a deed. The plaintiff administratrix alleged that the transfer to the defendant of real property was the result of fraud, undue influence, and lack of mental capacity. The trial court found in favor of the defendant. The plaintiff administratrix appealed to this Court. We affirm.

Plaintiff/Appellant, Rosie Johnson ("Johnson"), is the surviving spouse of decedent Clyde Johnson. She is also the administratrix of the Estate of Clyde Johnson. Rosie and Clyde Johnson separated in 1990, and Rosie Johnson filed for divorce in August, 1992. Clyde Johnson suffered a stroke in December, 1992. Rosie Johnson then dismissed the complaint for divorce and the Johnsons legally remained husband and wife. The Johnsons never reconciled after their 1990 separation, however, and lived apart until the time of Clyde Johnson's death.

Defendant/Appellee, Delia Avery ("Avery"), is the aunt of Clyde Johnson; Avery is Clyde Johnson's mother's sister. On December 30, 1992, the decedent's mother, Louella Gayles ("Gayles"), signed a quit claim deed transferring her residence located at 921 Randall Street, Memphis, Tennessee, to her sister, Avery, and to her son, Clyde Johnson. Absent the quit claim deed, Clyde Johnson would have inherited the entire residence. It was undisputed that Gayles was admitted to the hospital several hours after the quit claim deed was signed. The principal diagnosis was senile dementia with delirium. On July 31, 1996, Plaintiff, Rosie Johnson, Administratrix of the Estate of Clyde Johnson, filed a complaint to set aside the quit claim deed signed by Gayles, alleging that she lacked the mental capacity to execute the deed.

The parties stipulated to the accuracy of the medical records introduced at trial, except for the initial hospital admittance form completed on December 30, 1992. The parties also stipulated that Gayles suffered from a form of dementia. They agreed that evidence concerning Gayles' behavior in the years and months prior to the signing of the quit claim deed would not be an issue at trial.

Gayles signed the quit claim deed at about 1:00 p.m. on December 30, 1992 at Avery's home, where Gayles was living. Gayles had resided with Clyde Johnson until he suffered his stroke. She then moved in with her sister, Avery. Avery, her two daughters, Catherine Swearengen and Ella

2

Malone, and Judge James Swearengen, who is the brother of Catherine Swearengen's husband, were present when Gayles signed the quit claim deed.

The medical records introduced at trial show that on the afternoon of December 30, 1992, when Gayles was taken to the hospital, she had a principal diagnosis of "senile dementia with delirium." The hospital admittance form for December 30, 1992 indicates that Gayles' family reported that she was not sleeping well and was pulling knives and fighting with family members. One form notes that Gayles' granddaughter stated that Gayles suffered from Alzheimer's disease. Throughout Gayles' approximately nine-day stay at the hospital, the records consistently state that she was confused and disoriented as to place and time. There were numerous reports that Gayles routinely wandered the hospital and was unable to care for herself. After nine days in the hospital, Gayles was discharged to a nursing home, where she remained until she died.

Avery was ninety-three years old at the time of trial. She testified that, on the day the deed was signed, Gayles did not pull a knife on anyone. Avery explained that she kept a knife in the door, for protection, and that on that day Gayles simply took the knife out of the door and handed it to her. She stated that, on the day the deed was signed, Gayles had no trouble recognizing members of her family. Avery testified that the family members took Gayles to the hospital that night because of Gayles' repeated attempts to leave the home late at night. She denied telling the hospital staff that Gayles was threatening family members. In fact, Avery testified that Gayles knew what she was doing when she signed the quit claim deed and that her motive for signing the deed was to give Clyde Johnson a place to live while Rosie and Clyde Johnson were separated.

Catherine Swearengen, Avery's daughter and Gayles' niece, who was also present when the quit claim deed was signed, testified at trial that James Swearengen brought the quit claim deed with him when he arrived at Avery's house on the day Gayles signed the deed. She stated that James Swearengen did not question Gayles before she signed the deed. She denied that, on the day the deed was signed, Gayles threatened anyone with a knife, was mentally confused when she signed the deed, engaged in wandering behavior, or could not recognize family members. Catherine Swearengen could not remember taking Gayles to the hospital the evening after Gayles signed the deed, and denied telling the emergency room staff that Gayles had not slept in over twenty-four hours and wandered the streets. Catherine Swearengen asserted that Gayles' motive for signing the quit claim deed was twofold: to prevent the State from acquiring the home if Gayles were admitted

3

to a nursing home, and to prevent Rosie Johnson from acquiring an interest in the home. In regard to Gayles' mental state, Catherine Swearengen stated that on occasion Gayles would be fine in the morning but confused by the afternoon. She testified that Gayles had sufficient mental capacity when she executed the deed.

Gayles' other niece who was present when the deed was signed, Ella Malone, testified that she accompanied Gayles to the hospital and told the hospital staff that Gayles sometimes would pack her belongings, wander around, and try to get out of the house. She denied telling the hospital staff that Gayles pulled a knife on family members. She explained that,

> My mother's house is an old house and she uses what we call a case knife in her front door and she uses one in the back door. This is to help her with protection. And my aunt, Aunt Louella, did take the knife out of the door, but she handed the knife to Mama.

Ella Malone testified that, even after Gayles signed the quit claim deed, she thought that Gayles was "really alert during that time because they had done [sic] to the Dollar Store." In Ella Malone's opinion, Gayles understood what she was doing when she signed the deed, and did not want Rosie Johnson to have an interest in the house.

James Swearengen did not testify at trial but stated in his deposition that, because of the separation of Rosie and Clyde Johnson, it was Gayles' desire that Rosie Johnson not inherit anything. He explained:

> And her real worry was that if she died, it would go to her son, and if something happened to him, and he was already ill, that it would go to the daughter-in-law, and she was adamant that she didn't want this daughter-in-law, who she thought had been unfaithful to her son during the years and had totally abandoned him during his illness . . . . She told me that the lady was not any good and that she didn't want her to get a cotton picking thing that she had, because she thought she hadn't dealt fairly with her son.

Regarding Gayles' mental state at the time the deed was signed, James Swearengen stated that "she was well aware of the nature of the transaction at the time she did it." He was confident that she understood the effect of the quit claim deed: "I asked her if she understood that this was a deed that would give her interest in the property to her sister and her son, and she said yes." He concluded, "Listen, I have seen this lady year in and year out . . . and if she had been disoriented, I think I would have recognized it." James Swearengen did not know who prepared the quit claim deed.

4

After a bench trial, the trial court found that Johnson had failed to carry her burden of proof: "The Court recognizes the burden of proof to be upon the Plaintiff, that the events of the hospitalization do not persuade this Court at this time that at the execution of this document that the decedent was unable to understand what she was signing." Accordingly, the trial court granted judgment in favor of the defendant, Avery. From this order, Johnson now appeals.

On appeal, Johnson argues that the trial court erred in failing to set aside the quit claim deed in light of the medical records reflecting Gayles' mental state at the time she signed the deed. The causes of action based on fraud and undue influence were dropped on appeal.

Our review is governed by rule 13(d) of the Tennessee Rules of Appellate Procedure, which provides that review of findings of fact by the trial court shall be *de novo* upon the record of the trial court, accompanied by a presumption of correctness of the findings of fact, unless the evidence preponderates otherwise. *See Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993); Tenn. R. App. P. 13(d).

Johnson urges on appeal that the medical records in this case establish that Gayles could not have been mentally competent when she signed the quit claim deed on December 30, 1992. Avery asserts that the comprehensive testimony at trial indicates Gayles was mentally competent at the time the deed was signed, despite her confusion and disorientation later that day. As stated above, the trial court found that Gayles was mentally competent at the time the deed was signed. The trial court stated,

> The Court recognizes that a person who has a dementia or an Alzheimer's condition, a person in advanced years, can have a time when they're in and time when they're out, so to speak. . . . [T]he events of the hospitalization do not persuade this Court at this time that at the execution of this document that the decedent was unable to understand what she was signing. In fact, to the contrary, the Court relies on collective testimony, in particular that of Judge Swearengen . . . to the effect she did understand what she was doing.

"In order for a deed to be valid, it must be the conscious, voluntary act of the grantor, and a deed executed when the grantor is mentally unbalanced, has no intelligent comprehension of the performance of the act, and is incapable of transacting is void." *Bright v. Bright*, 729 S.W.2d 106, 109 (Tenn. App. 1986) (citing *Hinton v. Robinson*, 51 Tenn. App. 1, 9, 364 S.W.2d 97, 100 (1962)).

When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn*

5

*Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. App. 1997).  The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

In this case, there is no question that, shortly after the execution of the deed, the decedent was mentally confused and disoriented and was hospitalized.  However, the proof indicates that, although the decedent later suffered from symptoms of dementia, at the time the deed was executed, she understood the effects of the deed and the property it conveyed.  All three witnesses to the execution of the deed testified as to Gayles' competency at the time the deed was executed.  These witnesses also testified that Gayles' reasons for executing the deed were to prevent the home from being taken over by the State if she were admitted to a nursing home and to give her son a place to live while he was estranged from Rosie Johnson.  These reasons reflect a grantor with sufficient mental capacity to execute a deed.  While the evidence of her later hospitalization is significant, it does not vitiate the testimony of the witnesses who were present at the execution of the deed.  Giving appropriate weight on appeal to the credibility determinations by the trial court, we find that the evidence does not preponderate against the trial court's factual finding that Gayles was competent at the time the deed was signed.  Consequently, we affirm the judgment of the trial court in favor of Avery.

The decision of the trial court is affirmed.  Costs are taxed to Appellant, for which execution may issue if necessary.


_____

_____**HOLLY KIRBY LILLARD, J.**

**CONCUR:**


_____

**W. FRANK CRAWFORD, P. J., W.S.**


_____

**ALAN E. HIGHERS, J.**

6