IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 7, 2000 Session

## DONNA ROXBURY BREEDING (HENSON) v. KENNY FRANK BREEDING

**An Appeal from the Chancery Court for Giles County**
**No. 7928     Jim T. Hamilton, Judge**

_____

**No. M2000-00952-COA-R3-CV - Filed April 5, 2001**

_____

This is post-divorce custody dispute. In the original divorce decree, the mother was awarded custody of the parties' two minor children. Subsequently, when the mother was required to undergo brain surgery, the mother and father agreed, and the trial court ordered, that the father would have custody of the children until each child reached the age of twelve, at which point the child would decide with which parent he wished to live. After recovering from the surgery, the mother filed a petition to change custody citing, *inter alia*, the children's desire to live with her and the children's worsening behavior, which included running away from the father's home. The trial court denied the mother's petition, finding no material change in circumstances warranting a change of custody. From this order, the mother now appeals. We reverse and remand, finding that the trial court applied the incorrect standard in light of the prior agreed order.

**Tenn. R. App. P. 3; Judgment of the Chancery Court is Reverse and Remanded.**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which DAVID R. FARMER, J. and BEN H. CANTRELL, P. J., M.S., joined.

Joanie L. Abernathy, Franklin, Tennessee, and Howell Forrester, Pulaski, Tennessee, for the appellant Donna Roxbury Breeding Henson.

Samuel B. Garner, Jr., Pulaski, Tennessee, for the appellee Kenny Frank Breeding.

**OPINION**

Donna Roxbury Breeding ("Mother") and Kenny Frank Breeding ("Father") divorced in 1993. Both Mother and Father have since remarried. At the time of the divorce, Mother was granted custody of the parties' two minor sons, Kenny, born in September, 1986, and Austin, born in August, 1988. Mother retained custody of the boys, apparently without serious problems, until November 1997. At that time, Mother learned that she would have to undergo brain surgery. She did not know if or when she would recover sufficiently to be the boys' primary custodian. In light of this, the

parties entered into an agreement which was incorporated into an order entered by the trial court. The agreed order gave custody of the boys to Father. The order forgave Father's arrearage in child support, stated that Mother would not pay child support, and provided that Mother would have visitation every other weekend and "have the right to call the children or talk with them by phone on any occasion that she wishes. . . ." The order then stated as follows:

> At the time each of these children are twelve years of age they should be allowed to decide which parent they wish to be with. If the children cannot or will not decide what parent they wish to be with then the court will make that decision for them.

Thus, under the agreed order entered by the trial court, when each boy reached the age of twelve, he would be permitted to state which parent he wished to live with and that preference would be honored.

Mother recovered from the brain surgery and was left with only minor disabilities that would not interfere with her ability to be the boys' primary custodian. Meanwhile, problems developed between the boys and Father and between Mother and Father. In addition, Father indicated an intent to move with Kenny and Austin to Birmingham, Alabama. Consequently, in December, 1999, the boys ran away from Father's home to Mother's home.

On January 6, 2000, Mother filed a petition for change of custody,[1] pursuant to the November 1997 agreed order. She alleged that Kenny and Austin had expressed a desire to live with her. Mother argued that there had been a material change in circumstances since the November 1997 order, citing her improved physical condition, the boys' dissatisfaction with living with their father, the incident in which they ran away to Mother's home, and Kenny's precipitous drop in grades. She also criticized Father's care of the boys, particularly with regard to Austin's asthma.

The situation worsened between the parties and between the boys and Father. Father began listening in on an extension to the boys' telephone conversations with Mother. As a result, Kenny and Austin began writing letters to Mother about their feelings and concerns. The boys would write the letters at school and give the letters to a school friend, who lived near Mother, to deliver. After Austin would not eat some soup made by his stepmother, Father pulled down his pants and spanked him. Finally, the night before the hearing on Mother's petition to change custody, the boys again ran away from Father's home, sneaking out of a window after dark and riding over seven miles toward Mother's home, until they were intercepted by a police officer.

The hearing was held the next day, February 25, 2000. At the hearing, Mother testified that around 9 pm the night before, she received a phone call from the boys telling her that they were at a Quik Mart store near her home, and that they had run away from Father's home, riding their bikes

---

[1]Previously, Mother had filed a petition seeking, *inter alia*, a change in custody, which was denied after a hearing on January 5, 2000. This petition is not part of the record on appeal, and the trial court's order was apparently not appealed.

over seven miles from Father's house. They were finally intercepted by a police officer who stopped them for riding their bikes at night without lights. After talking to Kenny and Austin, Mother called her attorney, picked up the boys and called Father to tell him where they were and what had happened. Father was unaware that the boys were not at his home until Mother called him.

Mother testified that she was concerned about the boys' welfare because Father failed to adequately care for them, because they had run away more than once while living with Father and because Kenny had been doing poorly in school. She testified that she, not Father, provides inhalers and other medicine for Austin, who suffers from borderline anemia in addition to asthma. She also testified that she pays the boys' school monthly so they can eat breakfast at school, because they usually do not eat breakfast before leaving for school. Mother acknowledged buying normal gifts for the boys, said she and her husband were building a playhouse for Kenny and Austin, as well as for her stepson, and that the family had a membership at Martin College. She denied the assertion by Father's counsel that these items were bribes to get the children to say they wanted to live with her. Mother denied telling Kenny and Austin to start writing her letters, but admitted that she had spoken to them about writing to her about things they felt they could not say while Father was listening over the phone.

Father also testified at the hearing. He admitted that he listens to the boys' conversations with Mother, but asserted that it was for their protection because they had run away before and because he does not trust Mother. Father claimed that he heard Mother tell the boys to talk to their school counselor and begin writing letters to use in the custody suit. Father maintained that Mother called the boys more often since filing her petition to change custody, and that he has had to limit the boys' conversations with Mother to ten minutes each.

Father testified that when Kenny turned twelve he offered to allow Kenny to live with Mother, but that she refused to take one boy without the other. Father admitted pulling down Austin's pants and spanking him with his hand, not a belt. However, he denied doing so simply because Austin refused to eat the soup made by his wife; he asserted that he punished Austin because he was rude and disrespectful. Father contended that the boys' behavior had worsened since Mother filed her petition and that disciplining them had become more difficult. Father admitted that their behavior also began to worsen after he told them he was considering moving with them to Alabama. He contended that the boys were excited when he first talked to them about the prospect of moving, and that only after they spoke with Mother did they say that they did not want to move.

At the time of the hearing, Kenny and Austin were 13 years old and 11½ years old, respectively. They testified in open court and were questioned by the parties' attorneys, with Mother and Father outside the courtroom.[2] Kenny and Austin both testified that they no longer wished to live with Father, but wished to live with their mother. Kenny and Austin testified about their

---

[2]Although children involved in custody disputes are usually questioned in chambers by the trial judge, in order to encourage them to speak openly and without being intimidated, these children testified in open court and were questioned at length by the attorneys.

decision to run away the night before. They said that they climbed out of their bedroom window and, using flashlights, rode their bikes down the highway toward their mother's house. The boys said that they ran away because they were tired of the living situation at Father's home and wanted to live with Mother. They said that Father did not listen to them, did not support some of their activities, sometimes punished and yelled at them without a reason, and listened in on their telephone conversations with Mother even though they asked him not to. Austin testified that Father pulled down his pants and gave him a "whipping" with a belt, because he refused to eat some soup that his stepmother made. He said that he refused to eat the soup because he was sick and that the "whipping" left bruises on him. When asked why he wrote letters[3] to his mother, Austin testified, "I had to get it off my mind I felt so bad and I thought she needed to know." He said that he could not tell her on the telephone because "my dad was listening" and that he "couldn't say nothing on the phone without daddy jumping all over me after it was over."

Kenny testified that the night he and Austin ran away he had been punished for receiving an "F" in gym class. He asserted that his grades have dropped while living with Father, but conceded that his grades had been good until the custody petition. Austin testified that he was also being punished the night they ran away. Austin also testified that he is sick much of the time and that Mother buys his medicine for him. He asserted that Mother took better care of him. The boys testified that they did not eat breakfast at their Father's house before school because it is too early.

In response to rigorous cross-examination by Father's counsel,[4] the boys denied deliberately failing classes, denied that Mother suggested that they write letters to her, denied that Mother told them what to write in the letters, denied writing letters to Mother for her to use in the custody proceeding, denied that Mother promised to buy them items such as toys and a playhouse if they came to live with her, denied that Mother only recently began calling them every night, denied engaging in very long telephone conversations with Mother every night, denied running away from Father's home simply to avoid being punished, and denied crying and screaming in the courthouse after the prior court hearing at Mother's suggestion.[5] When asked if there was anything each boy wanted the trial judge to know, Kenny responded, "I just want to go to my mom's house that's all," and Austin said, "I just want to go with my mom. I don't know why I can't. That's where I belong. She cares for me."

---

[3]Inexplicably, the letters were not made part of the record.

[4]The lengthy, accusatory cross-examination of the children by Mr. Garner, Father's counsel, would be appropriate if it were cross-examination of an adult defendant in a criminal proceeding, but does not befit a proceeding in which the trial court seeks to elicit the views and feelings of children who are unfortunately in the midst of a custody dispute between their parents.

[5]At the end of the cross-examination of Austin the trial judge commented, "Well all right Austin, keep making these good grades you might want to be a lawyer one of these days. You think you would?" Not surprisingly, Austin's response was "No."

In its written order, the trial court stated that, because of Kenny and Austin's age and maturity, their wishes must be considered. Nevertheless, Mother's petition for change of custody was dismissed. The trial court found that Mother failed to carry her burden of proof that a material change in circumstance had occurred warranting a change of custody. From this order, Mother now appeals.

Our review of this case is governed by Rule 13(d) of the Tennessee Rules of Appellate Procedure, which provides that review of findings of fact by the trial court shall be *de novo* upon the record of the trial court, accompanied by a presumption of correctness of the factual findings, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's decisions on issues of law are reviewed *de novo*, with no presumption of correctness. *Id.*

Ordinarily, the primary inquiry when considering a petition to modify custody is whether there has been a material change in circumstances since the entry of the order sought to be modified. *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App.1999), *perm. to appeal denied* May 15, 2000. In order to be considered a material change in circumstances, the facts or circumstances involved must affect the child's well-being in a material way. *Id.* at 829. If the trial court finds a material change of circumstances, it must then consider whether modifying custody would be in the best interest of the child. *Id.* at 828. A child's preference is one factor to be considered in determining custody. *Id.* at 829; *King v. King*, No. 01-A-01-9803-CV00116, 1999 WL 267007, at *5 (Tenn. Ct. App. May 5, 1999).

This case, however, involves a unique situation. The order sought to be modified is an agreed order, entered in light of Mother's then-impending brain surgery. As an explicit condition of the grant of custody to Father, the parties agreed:

> At the time each of these children are twelve years of age they should be allowed to decide which parent they wish to be with. If the children cannot or will not decide what parent they wish to be with then the court will make that decision for them.

This condition was not simply a side agreement entered into by the parties, it was adopted by the trial court as part of its November 19, 1997 order. In the hearing below, while there were questions regarding the reasons for the boys' preference, both were consistent, even adamant, in maintaining that they wanted to live with Mother.

When an agreed custody order contemplates a certain condition as a circumstance of the custody arrangement, a change in this condition may be a material change in circumstances sufficient to warrant a modification of custody. In *Waters v. Layne*, No. 01A01-9708-CV-00402, 1998 WL 136129 (Tenn. Ct. App. Mar. 27, 1998), the agreed order between the parties provided that "[t]he parties have agreed that the custody of the said minor child shall be placed with the Defendant [father] and wife Judy Layne." *Id.* at 4. The Court found that the father's marriage to Judy Layne had been of great significance to the child, because Judy Layne had been the child's primary

caregiver for over three years. The Court concluded that the specific language of the agreed order "contemplated the child be under the care of Ms. [Judy] Layne as a circumstance of the [f]ather's custody. . . ." *Id.* Consequently, despite the fact that the father had again remarried, his divorce from Judy Layne was a material change in circumstances. The court then affirmed the trial court's award of custody to the mother.

In this case, the language adopted by the trial court in its November 1997 order indicates that at the point the boys reach age twelve, the issue of custody will be revisited regardless of whether circumstances have changed. Indeed, the language in the order states expressly that, at that point, the boys' preference will be honored. Clearly this provision was included "as a circumstance of the Father's custody." *Waters*, at *4.

While the preference of the children is always a factor to be considered, in light of the express provision in the November 1997 order, in this case the children's preference must be given additional weight. To do otherwise would undermine the ability of parties to enter into a consent order and be confident that the agreed-upon terms, adopted by the trial court, will be honored in future proceedings. In this situation, at the least, the boys' decision that they wish to live with Mother must be deemed a material change in circumstances sufficient to warrant a change in custody. This is particularly so in view of the evidence of the boys' emotional state and actions resulting from their desire to move back to Mother's home, now that she has sufficiently recuperated from her brain surgery.

Despite the mandatory language of the November 1997 order, the trial court must retain the ability to consider the best interest of the children. Regardless of the boys' stated preference, the trial court must determine whether changing custody back to Mother would not be in their best interest. As part of this determination, the trial court must consider the willingness of each parent to encourage a close and continuing relationship with the other parent. *See* Tenn. Code Ann. § 36-6-106(a)(10)(Supp. 2000). This is important in light of the trial court's statement in its order that "both parties have made derogatory remarks about one another to their minor children." Equally important is Father's admission that he voluntarily listens in on an extension to the boys' telephone conversations with Mother, which was not addressed by the trial court in its order. Such behavior is clearly in contravention of Mother's "right to unimpeded telephone conversations" with the boys; it undermines Mother's relationship with the children and must cease. Tenn. Code Ann. § 36-6-110(a)(1)(Supp. 2000). The children should not have to resort to transmitting secret letters to the non-custodial parent in order to speak freely. On remand, this issue should be addressed by the trial court.[6]

---

[6] On remand, if the children are required to testify, they should be questioned, preferably by the trial judge, in a manner appropriate for children in a custody dispute.

The decision of the trial court is reversed and remanded for further proceedings consistent with this Opinion. Costs are taxed to the appellee, Kenny Frank Breeding, and his surety, for which execution may issue if necessary.

 

 

_____
HOLLY K. LILLARD, JUDGE