IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 16, 2007 Session

## LINDA CHERRY, ET AL. V. ROBERT M. CHERRY, ET AL.

**A Direct Appeal from the Chancery Court for Lauderdale County**
**No. 12,344    The Honorable Martha B. Brasfield, Chancellor**

---

**No. W2007-00122-COA-R3-CV - Filed October 23, 2007**

---

In this appeal, the trial court determined that a deed to the involved property created a resulting trust in favor of the family of the deceased grantor property owner. Grantee appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

J. Thomas Caldwell of Ripley, Tennessee for Appellant, Robert M. Cherry

T. D. Forrester of Covington, Tennessee for Appellees, Lindy Cherry, individually and as Next Friend of her minor hcildren, rebecca Lynn Cherry, James Franklin Cherry, Bessie Lorraine Cherry, and Maggie Elizabeth Cherry

### OPINION

### Facts and Procedural History

This is a dispute involving real estate owned by five brothers, James F. Cherry (hereinafter Mickey Cherry), Robert Cherry (hereinafter Bobby Cherry), William Cherry, Gerald Cherry, and Charles Cherry. On November 23, 2001, Mickey Cherry passed away at the age of 68. He was survived by his wife, Linda Cherry, and their children, Rebecca, James, Bessie, and Maggie Cherry (hereinafter Mickey Cherry's family). Although Mickey and Linda Cherry were married only three months before his death, they had resided together since 1977. Mrs. Cherry and her children are the Plaintiffs/Appellees in this suit and Bobby Cherry is the sole Appellant herein.

In the mid-1960's, the five brothers purchased and became owners as tenants in common of two tracts of land known as the Archer farm and Meadows farm. For several years, Bobby and Mickey Cherry, operating as the partnership "Cherry Brothers," farmed on those two farms and on other farms. The income/rent generated by the farming operations on the two farms was used to pay the mortgage payments on the farms. If the income produced by the farms was insufficient to pay the mortgage payments, the brothers were to pay the deficits. William, Bobby, and Gerald Cherry testified at trial that Bobby Cherry and sometimes William Cherry would pay Mickey Cherry's deficit, and that Gerald Cherry would pay Charles Cherry's deficit.

Bobby Cherry incurred substantial debt, which he attributed to the farming business. In 1989, the lending institutions began foreclosure proceedings on Bobby Cherry's interest in the farms. William Cherry paid the debt and purchased Bobby Cherry's interests in the farms to stop the foreclosure proceedings.

During most of his adult life, Mickey Cherry was plagued with emotional problems and alcohol dependency, which required more than one hospitalization. Although testimonies conflict regarding how much Mickey contributed to the farming from the late 1970's to 1985, it is undisputed that he was not able to work a 40-hour work week on a regular basis, and his disabilities completely prevented him from farming the last fifteen years of his life. Although his other brothers received their share of the farm proceeds once a year, Mickey Cherry was paid his portion by the month.[1] After William Cherry acquired Bobby Cherry's interest, he collected the farm proceeds/rents and disbursed them in the following manner: William Cherry - 2/5, Mickey Cherry - 1/5, and Gerald Cherry - 2/5.[2]

On November 23, 2001, Mickey Cherry died. That year, William Cherry paid 1/5 of the farm rents to Linda Cherry. After Mickey Cherry's death, Linda Cherry contacted an attorney to force the sale of the land so that she and her children could receive her late husband's 1/5 interest in the land. At this point, Bobby Cherry produced and recorded a deed dated September 9, 1981, which purported to convey Mickey Cherry's interest to him. Prior to this date, Bobby Cherry had not told anyone, with the possible exception of his former wife, Jane Cherry, about this deed.[3] Once Bobby Cherry recorded the deed, William Cherry stopped paying Linda Cherry and began paying Bobby Cherry 1/5 of the farm rents.

---

[1] It is unclear from the record why Mickey Cherry was paid differently than the rest of his brothers, but in its Order, the trial court opined that due to "Mr. Mickey's illnesses, it [may have] served him better to receive his rent monthly rather than to receive it in one lump sum to prevent him from spending it all at one time and having no funds available for the remainder of the year."

[2] Gerald Cherry acquired Charles Cherry's 1/5 interest in the farms.

[3] It is disputed in the record when Jane Cherry learned of the deed.

On April 16, 2002, Mickey Cherry's family filed suit against Bobby Cherry, William Cherry, Gerald Cherry, and [4] to set aside the deed and collect the rents paid to Bobby Cherry in 2002 and thereafter. In the Complaint, Mickey Cherry's family alleges that Mickey Cherry's signature on the 1981 deed was a forgery and asks that the deed be set aside. Later, Mickey Cherry's family amended the Complaint, alleging, in the alternative, that if the trial court found that the deed was in fact signed and executed by Mickey Cherry, either that the execution of the deed was a result of undue influence, that the deed was executed without valid consideration and is void, and/or that the deed was executed without consideration and was intended to be in trust for Bobby Cherry to manage and care for the benefit of Mickey Cherry. In this final assertion, Mickey Cherry's family alleges that a resulting trust or a constructive trust was created.

Bobby Cherry filed an Answer, which denied the material averments and also filed a Counterclaim. The Counterclaim contended that the 1981 deed was made per an agreement between himself and Mickey Cherry in consideration of Bobby Cherry discharging Mickey Cherry's portion of the debt on the property obtained during their farming operation and in consideration of Mickey Cherry's receipt of rents on the property during his lifetime. Bobby Cherry contended that during Mickey Cherry's lifetime, Bobby Cherry looked after Mickey Cherry and paid all his debts and living expenses. Bobby Cherry also raised the affirmative defenses of laches and the statute of limitations. Based on these contentions, Bobby Cherry asked for a judgment in the amount of all the money paid for these debts and living expenses, should the deed be set aside. William Cherry, Gerald Cherry, and Charles Cherry also answered the Complaint, denying all material averments.

Discovery ensued, and the case went to trial. After hearing all the proof and allowing both parties to submit post-trial briefs, the trial court made the following factual findings:

> (1) [Mickey Cherry] suffered from alcoholism and mental illness; (2) he was convinced that his brothers were going to take his 1/5 interest in the farms; (3) a fight had occurred between him and a nephew over the property; (4) [Mickey Cherry] trusted [Bobby Cherry], because they were brothers and partners in the farming operation; (5) [Bobby Cherry] paid rent to [Mickey Cherry], took care of the farming operation, and at times attempted to look after [Mickey Cherry]; (6) [Bobby Cherry] could not give a specific reason as to why [Mickey Cherry] deeded the property to him; (7) [Bobby Cherry] admitted that he did not pay [Mickey Cherry] any consideration for this valuable interest in the property. The only explanation that [Bobby Cherry] could propose for the transfer of the property was that Mickey Cherry wanted [Bobby Cherry] to

---

[4] The three brothers, Bobby, William, and Gerald, were joined in the suit because they claim to be co-owners in the land; Robert Kent Cherry, a nephew of Mickey Cherry, was included in the suit because he is currently farming the land. For ease of reference, the defendants/appellants shall be referred herein collectively as the Cherry brothers.

have the property because [Bobby Cherry] has been so good to [Mickey Cherry]; (8) [Bobby Cherry] could offer no explanation for why he did not record the deed upon its execution, and testified that he had forgotten that he had the deed; (9) [Bobby Cherry] admitted that he told no one, with the possible exception of his former wife, [Jane Cherry], about the deed until after [Mickey Cherry's] death; (10) in 1984, only three years after the deed was executed, [Charles Cherry] filed a partition suit against the other brothers seeking a sale or partition of the farms which they owned together. [Charles Cherry] alleged that each brother owned a 1/5 interest in the property. When [Bobby Cherry] answered the lawsuit, he acknowledged that the five brothers each owned a 1/5 interest in the farms; (11) in 1990, [Bobby Cherry] deeded his own 1/5 interest to his brother, [William Cherry], because [William Cherry] paid [Bobby Cherry's] farming debts. [Bobby Cherry] did not tell [William Cherry] about the disputed deed or that he owned an additional 1/5 interest in the farms; (12) in 2001, [Mickey Cherry] sought legal advice from Mr. Don Walker III, an attorney in Dyersburg, Tennessee, about selling his 1/5 interest in the farms. [Bobby Cherry] and Mr. Walker went together to inspect the farms. [Bobby Cherry] knew that [Mickey Cherry] had consulted with Mr. Walker about selling his 1/5 interest. [Bobby Cherry] did not tell Mr. Walker that [Mickey Cherry] could not sell his 1/5 interest, because [Mickey Cherry] had deeded his 1/5 interest to [Bobby Cherry]; (13) after [Mickey Cherry's] death, [Bobby Cherry] discussed [Mickey Cherry's] interest in the land with [Linda Cherry] and the family. He attempted to convince them either to hold the land and continue to receive rents from the land or to allow [William Cherry] to purchase [Mickey Cherry's] 1/5 interest. [Linda Cherry] and her children went to an attorney to discuss selling [Mickey Cherry's] 1/5 interest in the farms. When [Bobby Cherry] realized they had been to an attorney, [Bobby Cherry] informed [William Cherry] of their intent to sell [Mickey Cherry's] 1/5 interest. At that time, he informed [William Cherry] that he had the deed to Mickey Cherry's 1/5 interest. [William Cherry] advised [Bobby Cherry] to record the deed, which [Bobby Cherry] did.

Based on the above findings, the trial court held that an implied resulting trust was created when Mickey Cherry transferred his 1/5 interest to Bobby Cherry. The trial court voided the deed, stating that:

[Mickey Cherry] trusted [Bobby Cherry] and deeded his 1/5
interest to [Bobby Cherry] not for [Bobby Cherry] to be the legal
owner, but so that [Bobby Cherry] could hold the land in
safekeeping for [Mickey Cherry] to prevent the other brothers from
taking the property from him. This Court finds that the proof is
clear and convincing.

The trial court explained its finding by stating that the property was held in trust for
Mickey Cherry because Bobby Cherry failed to record the deed, failed to tell anyone (with the
possible exception of Jane Cherry) about the deed, paid no consideration for the deed, and
testified that he forgot he had the deed. Further, when he conveyed his own 1/5 interest to
William Cherry, he neither conveyed nor told William Cherry that he also owned Mickey
Cherry's 1/5 interest. Bobby Cherry made similar omissions when talking with attorney Don
Walker III in 2001. In his pleadings and at trial, Bobby Cherry could give no realistic reason for
the transfer of property to him. Also, the court noted the implausibility of Mickey Cherry
transferring his 1/5 interest in the farm to his brother, as such a transfer would have been to the
severe detriment of Mickey Cherry and his immediate family.

The trial court found that the deed to Bobby Cherry should be declared invalid, that
Bobby Cherry was holding Mickey Cherry's interest in the property in trust for Mickey Cherry
and his family, and that consequently, Linda Cherry and her children are the legal owners of the
1/5 interest in the farm. Additionally, the trial court awarded $17,745.74 to Mickey Cherry's
immediate family which is the total of the rents from 2002, 2003, and 2004. Bobby Cherry had
received this money from William Cherry and the trial court ordered him to pay it to Mickey
Cherry's family.

As for Bobby Cherry's claim that he should be reimbursed for his payments of debts and
living expenses on Mickey Cherry's behalf, the trial court noted that Bobby Cherry had not made
a proper accounting to show what Bobby Cherry paid to Mickey Cherry over and above the rent
which was due Mickey Cherry. The trial court dismissed Bobby Cherry's claim. Bobby Cherry
appeals and raises the issues, as stated in his brief, of whether the trial court erred in finding and
decreeing a resulting trust created by deed from James F. Cherry to Appellant; in setting aside
said deed and awarding damages. Appellees also raise six issues, as stated in their brief:

1. The trial court was correct in finding that the property of James
F. "Mickey" Cherry conveyed to Robert M. Cherry was subject to a
resulting trust. Alternatively, this Court should find that the
property is subject to a constructive trust in favor of the Appellees.

2. Alternatively, the trial court erred in not finding that James F.
Cherry's purported signature on the deed was a forgery and the
subject of fraud.

-5-

3.  Alternatively, if James F. "Mickey" Cherry executed the deed in question, the trial court erred in not finding that the deed in question was executed as a result of the indue influence of Robert cherry when a confidential relationship existed.

4.  Alternatively, Appellant, Robert M. Cherry, should be estopped from claiming any rights and interest in the property.

5.  Appellees' claims were not barred by the statute of limitations.

6.  The trial court was correct in denying Appellant, Robert Cherry, restitution.

**Discussion**

This Court reviews findings of fact made by a trial court sitting without a jury under a *de novo* standard with a presumption of correctness for those findings. Tenn. R. App. 13(d) (2007). This Court reviews a trial court's conclusions of law *de novo* with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989).

Bobby Cherry argues that the trial court erred in finding a resulting trust. Specifically, they assert that because there is no proof of a violation of a confidential relationship, fraud, exertion of undue influence, or any other improper conduct by Bobby Cherry or his brothers, the trial court's finding of a "resulting" or "implied" trust is misplaced. We disagree.

Mickey Cherry's immediate family asserts that the trial court was correct in its decision, or in the event that the trial court erred, they argue that Mickey Cherry's purported signature on the deed was a forgery and the subject of fraud; that the deed in question was executed as a result of undue influence of Bobby Cherry; or that based on the doctrine of judicial estoppel, Bobby Cherry should be estopped from claiming any rights in the property.

As we noted in *Smalling v. Terrell*, "a resulting trust is a judge-formulated 'creature' by which the judicial authority is able 'to reach an interest in property belonging to one person yet titled in and held by another.'" *Smalling v. Terrell*, 943 S.W.2d 397, 400 (Tenn. Ct. App. 1996) (citing *Wells v. Wells*, 556 S.W.2d 769, 771 (Tenn. Ct. App. 1977)). We have cited with approval the definition of a resulting trust found in **Gibson's Suits in Chancery, § 26.05** (Inman, 8th Ed. 2004):

Resulting trusts are those which arise where the legal estate is disposed of, or acquired, without bad faith, and under such circumstances that Equity infers or assumes that the beneficial interest in said estate is not to go with the legal title. These trusts are sometimes called *presumptive* trusts, because the law presumes them to be intended by the parties from the nature and character of their transactions. They are, however, generally called *resulting* trusts, because the trust is the result which Equity attaches to the particular transaction.

Resulting trusts arise: (1) When property is conveyed, or devised, on some trust which fails, in whole or in part; (2) When land is conveyed to a stranger without any consideration, and without any use, or trust, declared; (3) Where the property is purchased and the title taken in the name of one person, but the purchase price is paid by another; and (4) Where the purchaser pays for the land but takes the title, in whole or in part, in the name of another.

A resulting trust will be decreed when necessary to prevent a failure of justice, and the equitable power to do so applies with respect to both real and personal property. It is generally proved by parol evidence, but the testimony must be clear and convincing. A mere preponderance is not enough.

*Id.* (Emphasis in original); *see also Estate of Wardell ex. rel. Wardell v. Dailey*, 674 S.W.2d 293, 295 (Tenn. Ct. App. 1983).

Our Supreme Court has described a resulting trust as follows:

The imposition of a resulting trust is an equitable remedy; the doctrine of resulting trust is invoked to prevent unjust enrichment. Such a trust is implied by law from the acts and conduct of the parties and the facts and circumstances which at the time exist and surround the transaction out of which it arises. Broadly speaking, a resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or

-7-

presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily being no fraud or constructive fraud involved.

While resulting trusts generally arise (1) on a failure of an express trust or the purpose of such a trust, or (2) on a conveyance to one person on a consideration from another-sometimes referred to as a "purchase-money resulting trust"-they may also be imposed in other circumstances, such that a court of equity, shaping its judgment in the most efficient form, will decree a resulting trust-on an inquiry into the consideration of a transaction-in order to prevent a failure of justice. However, the particular circumstances under which a resulting trust may arise varies from jurisdiction to jurisdiction.

*In re Estate of Nichols*, 856 S.W.2d 397, 401 (Tenn. 1993) (quoting **76 Am. Jur. 2d Trusts § 166** (1992)).

In examining the record before us in light of these authorities, we observe that there is substantial evidence to indicate that, whether stated expressly or not, Mickey Cherry intended for Bobby Cherry to hold his 1/5 interest in land to protect it from his other brothers and nephews. As the trial court points out in its order, this interest in land was Mickey Cherry's only income-producing asset, and he feared that his other brothers were trying to take it away from him. Mickey Cherry was obviously aware of the value of his interest, as he demanded to be paid monthly the rents to which he was entitled. Bobby Cherry's actions are consistent with a man abiding by his brother's wishes. In a 1984 partition suit filed by Charles Cherry regarding the same disputed property in this case, Bobby Cherry admitted in his Answer that Mickey Cherry was an equal tenant in common with the other four brothers. In 1983 and 1988, Bobby Cherry executed two deeds of trust. In those deeds, he represented that Mickey Cherry was a 1/5 tenant in common owner. During the divorce proceedings from his wife, Jane Cherry, Bobby Cherry did not disclose his additional 1/5 interest in the land. During Mickey Cherry's life, Bobby Cherry acted as if he did not own Mickey Cherry's 1/5 interest, but rather made many representations to the contrary.

In his brief, Bobby Cherry relies heavily on the *Smalling* case. In *Smalling*, when the decedent died, he left a 36 acre tract of land, including a house. *Smalling*, 943 S.W.2d at 398. His girlfriend filed an action for declaratory judgment asking the court to construe his holographic will. *Id.* The defendants, the decedent's grandmother and aunt, argued in part that they were entitled to the land because they made mortgage payments, tax payments, and improvements on the disputed land totaling more than $40,000. *Id.* at 400. The trial court held that a two acre tract and the house passed absolutely to his girlfriend, but that the remaining 34

acres passed under a resulting trust to the defendants. *Id.* at 399. The girlfriend appealed, and this Court reversed, finding, from the language of the decedent's Will, that he intended to leave all 36 acres to his girlfriend. *Id.* at 401.

In *Smalling*, we did not believe that it was an appropriate case for the imposition of an equitable trust partially because there was no proof that any of the payments made by the defendants were intended to extract an interest in any part of the farm, a fact which was evidenced by the aunt's own testimony. *Id.* at 402.

Here, we do not have a holographic will signaling the intent of Mickey Cherry. Rather, we have a brother who claims to have been deeded an interest in land because he "was good" to Mickey Cherry. This interest was the sole income-producing asset for Mickey Cherry, his wife, and their four children. While we cannot conclusively say that Mickey Cherry's signature on the deed was forged, suspicious circumstances surround the conveyance of Mickey Cherry's interest to Bobby Cherry. Further, Bobby Cherry's actions related to Mickey Cherry's interest during the 20 years after Mickey Cherry deeded the land to Bobby Cherry are quite different than the actions Bobby Cherry took with regard to his own 1/5 interest in the land. It is implausible for this Court to believe that Mickey Cherry's intent was for his wife and children to be left with nothing after his death and for his brother to keep it.

This Court has stated that, "[w]hen the trier of fact and the one who must judge the veracity of the witnesses finds that one witness is not telling the truth, a court of review which cannot view the witness and observe his or her conduct on the stand ought not to reverse that finding absent 'clear, concrete and convincing evidence to the contrary.' " *Browder v. Hite*, 602 S.W.2d 489, 494 (Tenn. Ct. App. 1980) (citing *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488, 490 (Tenn. Ct. App. 1974)). The trial court judged the credibility of the witnesses and resolved the issues against the Cherry brothers. We have examined the record and find the evidence does not preponderate against the Chancellor's findings of fact and that the trial court was correct in implying a resulting trust in this case.

Bobby Cherry also argues that Mickey Cherry's family should be barred from pursuing their claim. Specifically, Bobby Cherry contends that, in order to prevail in setting aside the conveyance on the grounds of fraud, Mickey Cherry's family must show facts to support a finding of fraud. In the alternative, Mickey Cherry's family must prove that the facts supporting a finding of fraud were concealed from them, so that they could not, by due diligence, have known those facts. First, we do not find a resulting trust on the basis of fraud. Had we found sufficient facts in the record to support a finding of fraud, then the equitable remedy would be imposition of a constructive trust.[5]

---

[5] A constructive trust may only be imposed against one who, by fraud, actual or constructive, by duress and abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, has obtained an interest in property which he ought not in equity or in good conscience retain.

(continued...)

Concerning Bobby Cherry's claim that Mickey Cherry's family's claim should be barred under the statute of limitations, we note that, in the case of a resulting trust, the statute of limitations does not begin to run until the trustee does some act hostile to the *cestui*. ***Vick v. Vick***, 499 S.W.2d 717, 721 (Tenn. Ct. App. 1968). We have already discussed how this case is void of any action taken by Bobby Cherry that was hostile to Mickey Cherry's interest. Mickey Cherry considered himself to be the owner of the property until the time of his death. He collected rents on the property from Bobby Cherry for his interest, even collecting rents after he quit farming. After Bobby Cherry transferred his 1/5 interest to William Cherry, Mickey Cherry collected rent from William Cherry. Bobby Cherry did not say or behave in a way that would have put Mickey Cherry on notice that he was holding the property adverse or hostile to the right of Mickey Cherry. Thus, this argument is untenable.

Finally, Bobby Cherry argues that because he allegedly paid all the debt of the "Cherry Brothers" partnership, he is entitled to a contribution for the loss of his interest in farmland from property owned by Mickey Cherry. Our review of the record reveals that Mickey Cherry's family filed the IRS returns of the partnership, and Bobby Cherry filed many cancelled checks, which were mostly from the partnership account. Other than these documents, we find no documents to show what, if anything, Bobby Cherry paid to Mickey Cherry over what Mickey Cherry was entitled to for rent. Also, many of the checks written from the partnership account do not clearly indicate the reason why they were being given to Mickey Cherry; consequently, we cannot say whether these checks were for rent or for additional monies above and beyond. The record is devoid of any accounting by Bobby Cherry showing the profit and loss of the partnership, expenses that were paid or any distribution of assets. Furthermore, Bobby Cherry has not shown what profits, losses, and expenses were due to the two farms originally owned by the five brothers, the farms purchased by the four brothers (excluding Mickey Cherry), or other property farmed by the partnership. Bobby Cherry has not produced a record to show the exact amount of money that he paid to Mickey Cherry for any deficits from 1964 through 1984, when the income from the two farms were used to pay the notes on the farm. In his brief, Bobby Cherry correctly states the partnership law, but without a proper accounting of the partnership debts, assets, and expenses, this Court is powerless to award him the expenses he seeks. T.C.A. § 61-1-807.

In light of the foregoing, we pretermit all remaining issues. The judgment of the trial court is affirmed. Costs of the appeal are assessed against the Appellant, Robert M. Cherry, and his surety.

_____
W. FRANK CRAWFORD, JUDGE

---

[5](...continued)
***Intersparex Leddin KG v. Al-Haddad***, 852 S.W.2d 245, 249 (Tenn. Ct. App. 1992) (citing ***Livesay v. Keaton***, 611 S.W.2d 581, 584 (Tenn. Ct. App. 1980)).